## SWIFT & CO. v. GLASGOW STEAM SHIPPING CO., Limited, et al.

(District Court, S. D. New York. May 5, 1921.)

1. Shipping ⬤═106—Assignee of bill of lading held entitled to all rights of shipper under contract of affreightment made before issuance of the bill.

Where goods were shipped under and against a contract of affreightment previously made between shipowner and shipper, the fact that bills of lading were made out by other company operating the ship under a charter from the shipowner to a bank, and assigned by the bank to a company of which the shipper was a subsidiary, did not debar the subsidiary from claiming all the rights that the shipper would have had, had the documents been made out in its name.

2. Shipping ⬤═106—Bill of lading not construed to modify previously made inconsistent contract of affreightment.

Where goods were shipped under and against a contract of affreightment, so that the rights of the parties were not necessarily based on the bill of lading subsequently issued, and the bill of lading differed from the contract of affreightment, prima facie, and in the absence of any intention to the contrary as between the parties, the bill of lading is not to be construed to modify the contract of affreightment.

3. Shipping ⬤═197—Contract of affreightment held not to debar shipper from sharing in general average.

Contract of affreightment, providing that the meat "is received and carried, as regards perils of any kind whatsoever, at the" shipper's "own risk absolutely," *held* not to deprive shipper of the right to share in the general average for the jettison of unsound meat; such provision relating solely to the liability of the shipowner as such to the shipper for the carriage of the cargo, and not to his obligation to share with others in the general average loss.

In Admiralty. Libel by Swift & Co. against the Glasgow Steam Shipping Company, Limited, and others, to obtain a readjustment in general average. Judgment for libelant.

Lord, Day & Lord, of New York City (Howard Mansfield and Allen B. A. Bradley, both of New York City, of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (J. Parker Kirlin and Mark W. Maclay, Jr., both of New York City, of counsel), for respondents.

MACK, Circuit Judge. Libelant was the owner of certain meat cargo, which, together with certain other cargo, was jettisoned when the steamship Kelvindale was stranded on Horseshoe Reef, off Virgin Islands, on a voyage from La Plata to New York. Libelant was wholly excluded from sharing in the benefit of the general average in respect to the sound as well as the unsound meat jettisoned, although it was compelled, along with other cargo owners, to contribute its share in general average.

The libel is brought against the Glasgow Steam Shipping Company Limited, the owner of the steamship Kelvindale, and against J. F. Whitney & Co. and Willcox, Peck & Hughes, the trustees for all concerned under the general average bonds. The case turns upon the interpretation and effect to be given to the charter party or freight agreement and bills of lading under which the cargo was shipped.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The charter party was made between the Glasgow Steam Shipping Company, Limited, as owner of the vessel, and Swift Beef Company, Limited, a British company, subsidiary of libelant, under date of December 31, 1913. It provided for the shipment of chilled beef and/or frozen meat and/or other cargo from La Plata and/or Montevideo to New York or Boston, or a direct port in the United Kingdom, at shippers' option, in eight consecutive voyages of the steamships Kelvinbank and Kelvindale, commencing about April, 1914. Clauses 12, 15, 21 and 22, which bear on the points in issue, read as follows:

"12. The shipowners undertake that the steamers named shall be (or are) classed 100 A 1 at Lloyd's with Lloyd's R. M. C. certificate, and that before loading meat in any insulated space or spaces they will obtain (or have obtained) the certificate of Lloyd's surveyor, or other person, in accordance with Lloyd's rules, that such insulated space or spaces and the refrigerating machinery have been surveyed and found in good condition and fit for the conveyance of refrigerated cargoes. The existence of such class, and the production of such certificate, shall be deemed to be conclusive evidence, against the shippers and consignees or indorsees of bill of lading, that the vessel, her engines, machinery, refrigerating machinery, spare gear and equipment and insulation, were at the loading, and at the commencement and during every stage of the voyage, in every respect sufficient and in a seaworthy and fit condition; and the existence of such class and certificate shall be deemed to satisfy and discharge every obligation or warranty, express or implied, under this contract or bill of lading, to provide a seaworthy and fit vessel for the voyage or any stage thereof; and, further, it shall absolutely exclude any claim for damage or loss or delay, on any ground whatsoever, the intention being that the meat is received and carried, as regards perils of every kind whatsoever, at the *merchants' own risk absolutely*, the shipowners not being responsible for unseaworthiness or negligence or default of themselves, their agents or servants, or any other person whomsoever, nor for any other peril of any kind or nature whatsoever, nor for any loss or damage of any kind arising from any cause or peril whatsoever.

"The above exceptions are to be read as absolutely unqualified by any other words, whether written or printed, appearing in this contract or implied therefrom, and full and complete effect shall be given to the aforesaid exceptions, anything to the contrary appearing herein notwithstanding: Provided, always, that nothing in this clause shall relieve the shipowners from their liability to provide steamers under clause 1 hereof."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"15. Shippers' cargo to be shipped under the customary form of bill of lading, subject always to the conditions named in this agreement, and so far as the conditions in the bill of lading differ from, or add to, or subtract from the conditions hereof they shall be of no effect."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"21. Should the cargo become putrid during the voyage it may be jettisoned at the captain's discretion; if it be landed in that condition or condemned by the port sanitary authorities, the consignees are to arrange for its removal from the ship's side and disposal at their expense.

"22. Notwithstanding any obligation herein imposed on the shipowners, or any other matter or thing in this contract contained, the shipowners are not to be liable for any loss or damage, however caused or brought about, which may be sustained by the shippers or consignees of the cargo, in consequence of the meat or any portion thereof becoming at any time after shipment unsound or damaged, or arriving, or being landed or delivered, in a damaged or unsound condition, or being jettisoned as having become unsound."

Libelant's cargo was shipped on the Kelvindale (which was then operated by Barber & Co. under charter from the Glasgow Steam Shipping Company, Limited) about November 24, 1914, from Puerto La

Plata, Argentina, by La Plata Cold Storage Sociedad Anonima, affiliated with libelant, and was consigned to the National City Bank, or assigns, the representative of libelant, under bills of lading which contained the following provision:

"Freight on live stock is payable on the number shipped without regard to and irrespective of the number and condition of those landed, and the master, owners, or agents of the vessel, or its connections shall not be responsible for the death of or injury to the stock however occasioned, and it is understood that no damage, injury or loss arising to live stock or dead meat, whether arising from jettison or otherwise, shall be recoverable under general average, but shall form a charge on such stock or meat."

The average adjusters apparently assumed that the rights of the parties were to be adjusted solely by reference to the bills of lading, for their statement contains the following explanation:

"Swift & Co., Puerto La Plata B/L—Meats.

"Statements have been presented to the adjusters, claiming in general average loss on meats by short delivery, amounting to some $22,813.13, which includes loss by jettison in salvage operations and by discharging at St. Thomas and dumping at sea the damaged meat considered worthless. (In respect of the above the adjusters find that all cargo, except that shipped at Buenos Ayres under bills of lading No. 1, for 300 bags alfalfa seed, and No. 2 for 150 bags alfalfa seed), was shipped under bills of lading with stipulation that no damage, injury, or loss to dead meat, whether arising from jettison or otherwise, shall be recoverable in general average, but shall form a charge on such meat. In accordance with such stipulation no allowance in general average is made herein for loss on meat jettisoned or damaged. * * *"

[1] In the circumstances of the present case, where the goods were shipped under and against a contract of affreightment previously made, the fact that the bills of lading were made out to the bank and assigned to Swift &.Co. does not debar the latter from claiming all the rights that its subsidiary, the Swift Beef Company, Limited, would have had, had the documents been made out in its name. Barber & Co., as charterer from the Glasgow Steam Shipping Company, merely took over the Shipping Company's contract of affreightment. This is not a case involving the rights of bona fide holders for value of bills of lading in any sense.

[2] Where, therefore, the rights of the parties are not of necessity based upon the bill of lading, and the bill of lading differs from the contract of affreightment, prima facie and in the absence of any intention to the contrary, as between the parties, the bill of lading is not construed to modify the contract of affreightment. Kruger & Co., Ltd., v. Moel Tryvan Ship Co. Ltd., [1907] A. C. 272; Rodocanachi Sons & Co. v. Milburn, 18 Q. B. D. 67; Carver, Carriage of Goods by Sea, § 151, p. 213; Scrutton, Charter Parties and Bills of Lading, art. 18. In view of the provision in the freight contract in the instant case, that so far as the conditions in the bill of lading differ from, or add to, or subtract from the conditions thereof, they should be of no effect, it cannot be assumed that the parties intended, by reason of any provision in the bill of lading, to modify the terms of the original contract. As, then, the contract of affreightment is controlling as between shipowner and shipper, the average adjusters should not have been guided in the present case solely by the terms of the bill of lading.

[3] Turning to the contract of affreightment, I am unable to accept the contention of counsel for the respondents that under its terms the shipper is debarred from claiming in general average for the jettison of sound meat. It is true that clause 12 of the agreement contains strong language to the effect that the meat is received and carried, as regards perils of every kind whatsoever, at the merchants' own risk absolutely. But, in my judgment, the words relate solely to the liability of the shipowner as such to the cargo owner for the carriage of the cargo, not to his obligation to share with others in a general average loss. The law of general average is an old law of the sea, and is not based on specific contract. While the language used here is somewhat stronger than that employed in Burton v. English, 12 Q. B. D., 218 (see also, Greenshields, Cowie & Co. v. Stephens & Sons, Ltd. [1908] K. B. 51, affirmed in [1908] A. C. 431), I cannot find in it an intent to deprive the cargo owner of his right to contribution in the event of a general average loss. The evidence adduced is not convincing that the customary form of bill of lading referred to in clause 15 of the contract of affreightment would include a provision depriving the cargo owner of this right.

It consequently becomes unnecessary to interpret the bills of lading as such, and the effect of the provisions contained therein, incorporating all the terms, conditions, stipulations, and exceptions contained in the charter party or freight contract, in the bill of lading, in addition to the exceptions and stipulations specifically set out, because the provisions taking from the libelant the right to share in a general average adjustment are inconsistent with the contract of affreightment, the terms of which remain effective, in the absence of evidence that the parties intended them to be modified or altered by the bills of lading.

There must, therefore, be a readjustment in general average, in which the libelant will be entitled to secure contribution from the general interests concerned by reason of the jettison of its sound meat.