**NICHIMEN COMPANY, Inc., Plaintiff-Appellee,**

v.

**M. V. FARLAND, her engines, boilers, etc., and A/S VIGRA, Defendants-Appellants-Appellees,**

v.

**SEABOARD SHIPPING CO., Ltd., Defendant-Appellant.**

**Nos. 624, 854, Dockets 72–1018, 72–1256.**

United States Court of Appeals, Second Circuit.

Argued April 12, 1972.

Decided May 12, 1972.

David L. Maloof, New York City (Donald M. Kennedy, and Donovan, Donovan, Maloof & Walsh, New York City, of counsel), for plaintiff-appellee.

M. E. DeOrchis, New York City (Chester D. Hooper, and Haight, Gardner, Poor & Havens, New York City, of counsel, for defendants-appellants-appellees.

William Warner, New York City (Symmers, Fish & Warner, New York City, of counsel), for defendant-appellant.

Before FRIENDLY, Chief Judge, and SMITH and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

This is an admiralty action brought in the District Court for the Southern District of New York by Nichimen Company, Inc. of New York, N. Y., against the M. V. Farland, her owner A/S Vigra, and her time charterer, Seaboard Shipping Co., Ltd. (Seaboard), for damage to 142 coils of steel, part of a shipment from Wakayama, Japan, to New Haven, Connecticut, in December, 1964. The ship and her owner, contesting liability to Nichimen, sought indemnity from the charterer if liability should be imposed. Judge Bonsal awarded the consignee damages of $75,353.66 with interest against the charterer and the owner and directed the charterer to indemnify the owner for any sums paid by the latter, to pay the owner $3,664.70 with interest for charter hire wrongfully withheld, and to pay the owner's reasonable legal fees of $10,750 incurred in resisting Nichimen's claim. Although we consider some of the issues more difficult than did the district judge and reach our results by different reasoning, we affirm the conclusions with respect to liability, and also with respect to indemnity and payment of the withheld charter hire. However, we hold that the defendants were entitled to the $500 per package limitation of § 4(5) of the Carriage of Goods by Sea Act (COGSA), and direct that the judgment be reduced accordingly.

## I.

### The Facts

With three small exceptions, which will be covered in the course of this opinion, it would be an exercise in futility to endeavor to improve on Judge Bonsal's statement of the facts, 333 F. Supp. 691, 693–696 (1971). Accordingly, we quote it in extenso:

Plaintiff, a wholly owned subsidiary of Nichimen Co., Ltd., purchased 280 coils of steel from Nichimen Co., Ltd. (of Tokyo, Japan) by invoice dated December 15, 1964 and irrevocable letter of credit payable on presentation of clean on board bills of lading.

On August 8, 1963, Vigra, as owner of the FARLAND, had entered into a time charter with Seaboard as charterer. Clause 8 of that time charter provided:

"8. . . . The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts."

On December 7, 1964, a "Freight Contract" was entered into between Seaboard as "Time-chartered Owners" and plaintiff as "Charterers" whereby Seaboard agreed to supply a minimum of two holds of the FARLAND for the transportation of plaintiff's steel coils from Wakayama, Japan to New Haven, Connecticut. The rate of freight was "$9.00 (nine dollars) U. S. Currency per long ton F.I.O. fully prepaid in New York on telegraphic advice of completion of loading and signing Bills of Lading." The "Freight Contract" provided further that:

"The carrier does not assume the care, custody, control or safety of, and shall not be liable for the cargo until after it is loaded on board the vessel, nor for demurrage, storage or any other charges that may accrue against shipment while awaiting delivery to vessel.

\* \* \* \* \* \*

"Subject to provisions of carrier's bill of lading form currently in use in connection with shipments to destination named above."

The coils consigned to plaintiff were loaded on board the FARLAND, a six hold self-trimming bulk carrier, at Wakayama, Japan, on December 14–15, 1964. The FARLAND had no 'tween deck.

The coils, which weighed from 3–9 tons each, were strapped by 1¼″ x ⅟₁₆″ steel bands—two around the circumference and five passing through the eye at equal intervals. This is the usual manner of strapping steel coils, and the strapping was sufficient for this type of cargo. Edge protectors consisting of steel strips were also used.

While plaintiff paid the cost of loading the coils on board the FARLAND under the "Freight Contract," the coils were stowed and lashed under the supervision of a "specialist" who was hired by Aall & Co., Ltd. ("Aall & Co."), Seaboard's port agent at Wakayama. One hundred forty-two coils were stowed in Hold No. 2 from the after bulkhead and forward in six rows, two tiers high. The forward row was not fully stowed, however, as there was an opening at the center which was shored off with heavy lumber. One hundred thirty-eight coils were stowed in Hold No. 4 from the after bulkhead and forward in three rows, three tiers high. In both Holds Nos. 2 and 4, the coils were stacked up at the after end and the remainder of the hold was left empty. All of the coils were stowed on the round with their ends facing fore and aft and were lashed with wire, turnbuckles and open turnbuckle hooks. The lashings were secured to pad eyes welded to the side bulkheads in Hold No. 2 and to pad eyes welded to the after bulkhead in Hold No. 4. According to the master of the FARLAND, "very little" wood was used, but some wood, in dimensions of 1 x 2, 2 x 4, 2 x 5, and 1 x 6, was used between some of the coils as dunnage to prevent them from shifting. The wire, turnbuckles, hooks,

pad eyes, and wood were provided by Aall & Co., Seaboard's agent. The master testified in his deposition that Seaboard's "specialist" directed that the coils be stacked at the after end of Holds Nos. 2 and 4 because the FARLAND was scheduled to stop at Vancouver, British Columbia, en route to New Haven to load Seaboard's lumber in all six holds and Seaboard desired as much space as possible in the bottom of Holds Nos. 2 and 4 to operate fork lifts when loading the lumber.

Nippon, Kaiji, Kentei, Kyokai, general marine surveyors, attended aboard the FARLAND on December 14–15, 1964, at the request of the shipper, Nichimen Co., Ltd., and reported on December 21, 1964 that the stowage of the cargo was proper and done in the best possible way to ensure safe transportation and delivery. In a deposition, the master of the FARLAND expressed his opinion that the coils had been properly stowed and lashed.

Upon completion of the loading on December 15, 1964, a bill of lading on Aall & Co.'s form was issued with respect to the 280 steel coils consigned to plaintiff. The bill of lading was signed by Aall & Co. "For and on behalf of the Master", and stated that the coils were shipped "in apparent good order and condition" by Nichimen Co., Ltd. on board the FARLAND for carriage from Wakayama to New Haven. The master testified that he did not see the bill of lading but that the usual practice was for Seaboard, or its agent, to sign the bills of lading on his behalf. The bill of lading was endorsed on the face as follows:

"Freight payable as per the terms and conditions of the Charter Party and/or the freight engagement.

"All the terms and conditions of the governing Charter Party and/or the Freight Engagement are herewith incorporated."

The Chief Mate signed a mate's receipt for the 280 coils.

The FARLAND sailed from Wakayama on December 15, 1964 for Van-

couver with approximately 2,000 metric tons of cargo aboard out of her carrying capacity of 16,220 metric tons. On the 18th of December, the FARLAND encountered a storm. According to the vessel's rough log, the winds increased during the day and by 2200 on the 18th, the winds had reached force 8 on the Beauford Scale (34–40 knots). The log entry for 2400 on the 18th states, "Ship is working heavily in the sea. Hull is shaking in trembling. Some water shipped." The log indicates that at 0120 on the 19th, the wind direction was east at force 10 (48–55 knots) and that the vessel's speed had been reduced; she was "lying on weather, pitching and some rolling." At 0500 on the 19th, the wind was E–NE and had reached force 11 (56–63 knots) and the vessel was "Lying in weather with steerage. Rolling and violent pitching." There follows an entry in the log which indicates that at 0815 on the 19th it was discovered that part of the cargo had shifted in Hold No. 2.

The master testified that at 0815 on the 19th "the whole cargo was shifted from the after end of the number 2 hold and spread all over the hold in one wave." He testified that this one wave, the height of which he estimated at 60 feet, lifted the FARLAND up, broke over her and dropped her "just like she fell off a rock." His inspection of the coils in Hold No. 2 shortly after 0815 on the 19th revealed that the lashings were broken. The master testified that the crew of the FARLAND had tightened the turnbuckles on the lashings in Hold No. 2 every day prior to the 19th.

At 1030 on the 19th, the following radio-telegram was transmitted by the FARLAND to Seaboard in Vancouver:

"CARGO IN NO TWO HOLD SHIFTED AND DAMAGED STOP AT THIS POINT NO DAMAGE TO THE SHIP SECURING OF SHIFTED CARGO IMPOSSIBLE STOP HOVED TO STOP WIND. FORCE 11 VERY ROUGH SEA

MASTER"

There is no reference to a 60-foot wave in either the log or in the radio-telegram

sent approximately two hours after the time the log indicates that the coils had shifted.

The FARLAND proceeded to Vancouver, arriving at the pier at 1900 on December 30. On arrival, the coils in Hold No. 2 were examined by Thomas W. Morgan, a marine surveyor, at the request of Seaboard, Vigra, and the cargo underwriters. Morgan's initial inspection revealed that approximately one-third of the steel coils had opened up to such an extent that the whole area of the lower hold was covered with unwound coils. The FARLAND was scheduled to load Seaboard's lumber in all six holds in Vancouver, and since Morgan determined that it was not practical to floor off the cargo in Hold No. 2 in its damaged and scattered condition, it was decided to cut some of the damaged steel and remove it to a scow placed alongside the vessel. Thereafter, part of the packaged lumber cargo was placed in Hold No. 2, the cut sections of steel coils were replaced in Hold No. 2, and all six holds of the FARLAND were filled with lumber. Morgan was of the opinion that this procedure was "the only practical method of tackling this situation." Seaboard paid all costs of cutting and restowing the steel sections in Vancouver.

The stowage of the lumber cargo was completed on January 15, 1965. It was snowing and raining throughout the loading operation, and the lumber stowed in Hold No. 2 with plaintiff's steel coils was soaking wet.

On January 18, the FARLAND proceeded to Boston and Providence to discharge Seaboard's lumber. Due to a longshoremen's strike, the FARLAND did not arrive in New Haven until March 1, 1965. On March 2, 1965, after the remaining lumber cargo had been discharged from the FARLAND, Captain Axel Jelstrup, a marine surveyor representing the cargo underwriters, Captain J. Stave, a marine surveyor representing Vigra; and George N. Axiotes, a marine surveyor representing Seaboard, inspected the steel coils in Holds Nos. 2 and 4. Their inspection of the coils in

Hold No. 4 revealed that the steel strapping had parted on three of the coils, which were partially unwound, but that there had been no apparent shifting of the cargo in that hold. Their inspection of the coils in Hold No. 2 revealed that some of the coils, originally stowed against the after bulkhead, were lying against the forward bulkhead. The coils, and loose sections of steel, were occupying the entire tank top area. Bands had broken on several coils, and the coils sprung or partly unwound. In some instances, the coils had telescoped causing considerable distortion of them. Excessive rust was present on all of the coils in Hold No. 2 which was attributable to moisture given off by the lumber which Seaboard loaded at Vancouver.

Plaintiff had arranged to sell 219 of the coils to The Eastern Steel & Metal Co., West Haven, Conn., for $182,632.-80, and the remaining 61 coils to Bowring Company, New York, New York for $48,-644.93. On March 4, 1965, the day after the discharge of the FARLAND was completed, Captain Jelstrup examined the coils on the property of the New Haven Terminals, Inc.

Representatives from plaintiff and the Eastern Steel & Metal Co., plaintiff's principal customer, were present. The other surveyors did not attend although they had been advised of the re-examination. Eastern's representative indicated that he would accept the cargo discharged out of Hold No. 4 as sound. Captain Jelstrup testified that following considerable negotiations with Eastern's representative concerning the coils discharged from Hold No. 2, an agreemnt was reached on the following values of the coils:

"40% of 142 coils reduced to scrap value of $20.00 per metric ton.

20% of 142 coils with agreed value of $30.00 per metric ton.

30% of 142 coils with agreed value of $40.00 per metric ton.

10% of 142 coils with agreed value of $60.00 per metric ton."

Captain Jelstrup was of the opinion that he made "a rather good minimization of the loss." Surveyor Axiotes, who represented Seaboard at the initial inspection of the coils in Hold No. 2 on March 2, stated in his survey report that while he was not a party to the negotiations, "considering all the factors . . . it appears that the [depreciation] allowances are not unduly high."

The resulting loss was $85,180.57.

## II.

### Nichimen's Recovery

The most basic controversy concerns the legal standard governing the liability of Seaboard and Vigra. Nichimen asserts, and the judge held, that the liability of Seaboard and Vigra was governed by COGSA, with the consequences that Nichimen established a prima facie case by proving receipt of the coils in good order and delivery in damaged condition; that the defendants then had the burden of establishing either that the damage was not due to their negligence, § 4(2) (q), or that it was the result of one of the "excepted causes" in § 4(2), if they were to escape liability; and that this was not met. Seaboard asserts that COGSA is not applicable in this case, since the Farland was engaged in private carriage; that as a result it and Vigra were liable simply as bailees; and that with respect to the question of negligence Nichimen did not bear the burden of persuasion which it would then have throughout, see, e. g., Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110–111, 62 S.Ct. 156, 86 L.Ed. 89 (1941); Kohlsaat v. Parkersburg & Marietta Sand Co., 266 F. 283, 284–285 (4 Cir. 1920). Although we are by no means certain that acceptance of Seaboard's contention that it and Vigra were simply bailees would call for a reversal,[1] the court was correct in holding COGSA to be applicable.

---

1. Under federal bailment law, the bailor, Nichimen, still made out a *prima facie* case of negligence merely by showing delivery of the coils in good order to the Farland and return in a damaged condition. See Leather's Best, Inc. v. S. S.

Treating the applicability of COGSA as depending on whether the Farland was engaging in public or private carriage, the judge held she was engaged in the former—even on the Pacific crossing when she was carrying only Nichimen's coils—because the vessel was scheduled to take on at Vancouver lumber owned by Seaboard Lumber Sales Co., Ltd., an affiliate of the time-charterer. If the applicability of COGSA turned exclusively on whether Seaboard could properly have been found to have held out the Farland as a common carrier, we should have the gravest doubts that the evidence warranted such a conclusion. In a different yet highly relevant context, the Interstate Commerce Commission said long ago, Craig Contract Carrier Application, 31 M.C.C. 705, 708 (1941):[2]

> Both in its original conception, and consistently since, the essential attribute distinguishing common carriage from private (contract) carriage has been the presence, or lack, of an offer of holding out to serve the public generally.

The Commission went on to say that the common element or characteristic negating a public offer was *"specialization,* either in the nature of the physical operation, or in respect of the shippers served. . . ." *Id.* at 711 (emphasis in original). In United States v. Contract Steel Carriers, Inc., 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482 (1956), the Supreme Court, while giving qualified approval to the *Craig* requirement of a

showing of "specialization" to negate common carriage, reversed the Commission for finding common carriage with respect to a "specialized" carrier which had served 69 shippers in three years. Here there was no evidence of a general holding out of the Farland and much of specialization. The mere addition of one or even two or three other large shipments would be an insufficient predicate for a determination of common carriage—if that were the decisive factor in resolving the applicability of COGSA.

The private-public carriage distinction was introduced into the area of liability for loss of cargo when this was governed by non-statutory maritime law. At one time, the public carrier of goods by sea was "absolutely responsible for their safe arrival, unless loss or damage was caused by the Act of God or of the public enemy, or the inherent vice of the goods or the fault of the shipper—*and* (even where the loss was caused by one of these) the carrier was not negligent or otherwise at fault." Gilmore & Black, The Law of Admiralty § 3–22, at 119 (1957) (footnote omitted). See also Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U.S. 397, 437, 9 S.Ct. 469, 32 L.Ed. 788 (1889). In contrast, the private carrier has traditionally been liable, as a bailee for hire, only for the negligent loss or injury of cargo, see Commercial Molasses Corp. v. New York Tank Barge Corp., *supra*, 314 U.S. at 108–109, 62 S.Ct. 156, and cases cited therein; Sumner v. Cas-

---

Mormaclynx, 451 F.2d 800, 812 (2 Cir. 1971). At that point, while, unlike under COGSA, the defendants would not have had to establish their freedom from negligence, they would had to have gone "forward with evidence sufficient to persuade that the non-existence of the fact [of negligence was] as probable as its existence," Commercial Molasses Corp. v. New York Tank Barge Corp., *supra,* 314 U.S. at 111, 62 S.Ct. at 161, if they were to escape liability. The facts surrounding the stowage of the cargo aboard the Farland, see *infra,* strongly suggest the defendants failed to do even the latter.

2. The ICC was speaking in the context of a case concerned with the regulation of

an interstate motor carrier. The extent of the ICC's regulatory authority was dependent on whether the motor carrier was a "common carrier by motor vehicle," a class of carrier defined in the first instance in 49 U.S.C. § 303(a) (14), or was a "contract carrier by motor vehicle," a class of carrier defined in the first instance in 49 U.S.C. § 303(a) (15). In the course of determining the motor carrier to be a common carrier, the ICC affirmed the conclusion that the statutory definitions—which at that time had just been amended—were "essentially declaratory of the common law," 31 M.C.C. at 710, and its remarks fully reflect this.

well, 20 F. 249, 261 (S.D.N.Y.1884), and this is subject to any agreements made by the parties, see, e. g., The Fri, 154 F. 333 (2 Cir. 1907), cert. denied, 210 U.S. 431, 28 S.Ct. 761, 52 L.Ed. 1135 (1908); The Elizabeth Edwards, 27 F.2d 747 (2 Cir. 1928); Koppers Connecticut Coke Co. v. James McWilliams Blue Line, Inc., 89 F.2d 865, 866 (2 Cir.), cert. denied, 302 U.S. 706, 58 S.Ct. 25, 82 L.Ed. 545 (1937); Knauth, The American Law of Ocean Bills of Lading 177–78 (4th ed. 1953). With the introduction of bills of lading as documents of title, public carriers increasingly used these as a means of contractually expanding upon the narrow set of common law "exceptions" to their otherwise absolute liability. See Gilmore & Black, *supra*, § 3–22, at 119–20. Ultimately, this process threatened to turn the general maritime law on its head, with English courts and some state courts—though not the courts of the United States—honoring even bill of lading provisions excepting public carriers from liability for loss due to their own negligence and that of their employees, see Knott v. Botany Worsted Mills, 179 U.S. 69, 71, 21 S.Ct. 30, 45 L.Ed. 90 (1900), Gilmore & Black, *supra*, § 3–22, at 121–22. It was in response to these developments, see The Delaware, 161 U.S. 459, 471–473, 16 S.Ct. 516, 40 L.Ed. 771 (1896), that the Harter Act was enacted in 1893 to protect those shipping cargo "from or between ports of the United States and foreign ports" against insertion "in any bill of lading or shipping document" of any provisions either relieving the vessel or its owners "from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery" of the cargo, § 1, 46 U.S.C. § 190, or lessening or abrogating their "obligations . . . to exercise due diligence [*sic*] properly equip, man, provision, and outfit" the vessel, "and to make [it] seaworthy . . . .", § 2,

46 U.S.C. § 191. Primary responsibility for the perpetuation of the old public-private carriage distinction under the new statutory regime seems to rest on an early decision of this court which held, properly enough, that a charter party was not governed by §§ 1 and 2 of the Harter Act because a "charter" is neither a "bill of lading" nor a "shipping document" within the meaning of those sections but, in so doing, reasoned that "sections [1 and 2] manifestly refer to common carriers . . . .", The G. R. Crowe, 2 Cir., 294 F. 506, 508, cert. denied, 264 U.S. 586, 44 S.Ct. 335, 68 L.Ed. 862 (1923).[3] See generally Knauth, supra, at 176–79.

The enacting clause of COGSA, adopted in 1936, provides that it shall regulate rights and liabilities under "[*e*]*very bill of lading or similar document of title* which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade . . . ." (emphasis added), and § 1 (b) of COGSA defines "contract of carriage" as applying "only to contracts of carriage covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea, including any bill of lading or similar document of title as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of same." Since the triggering terms in COGSA are much the same as those in §§ 1 and 2 of the Harter Act, it is understandable that courts, in determining the applicability of COGSA, have on occasion resorted to the public-private carriage distinction. See, e. g., Pacific Vegetable Oil Corp. v. M/S Norse Commander, 264 F.Supp. 625, 627 (S.D.Tex.1966); J. Gerber & Co. v. S.S. Sabine Howaldt, 310 F.Supp. 343, 350 (S.D.N.Y.1969), rev'd on other grounds, 437 F.2d 580 (2 Cir. 1971).

---

3. Some earlier suggestion of this reasoning can arguably be found in Knott v. Botany Mills, supra, 179 U.S. at 71–72, 21 S.Ct. 30, and The Jason, 225 U.S. 32, 49–51, 32 S.Ct. 560, 56 L.Ed. 969 (1912).

Nevertheless, we have found no decision suggesting that for purposes of applying COGSA there exists an exact correlation between common carriage and carriage pursuant to a "bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea." Put otherwise, no decision of which we are aware indicates that COGSA may not be applicable in particular instances of private carriage. This is true even if we assume—though we need not and certainly do not decide—that there is an exact correlation between private carriage and carriage pursuant to a charter party. Bills of lading are commonly issued in the context of charter parties, and thus while § 5 of COGSA provides that the "Act shall not be applicable to charter parties," it goes on to say that "if bills of lading are issued in the case of a ship under a charter party they shall comply with the terms of the Act." It is true that when there is a voyage or, even more clearly, a time charter, a bill of lading issued to the charterer-shipper, so long as it remains in his hands, usually is a mere receipt as between the parties to the charter and does not perform the additional function of a contract for the carriage of goods. The Marine Sulphur Queen, 460 F.2d 89, 103 (2 Cir. 1972); Gilmore & Black, *supra*, § 4–10, at 193–

94. However, there is no apparent reason why even under a traditional voyage charter covering an entire vessel the parties should not be able to agree [4] that the bill of lading shall "regulate the relations," § 1(b), between the charterer-owner and the charterer-shipper.[5] Hence, the nature of the parties' agreement with respect to bills of lading may effectively dictate the applicability of COGSA even though the carriage is of a private nature under a charter party.

In the unlikely event that Nichimen had done nothing more than enter into the "Freight Contract" and had received no bill of lading or similar document of title, COGSA could not have applied here by its very terms—even if there had been other shippers on the Farland—whether or not such a contract was deemed to be a charter party. However, Seaboard did not limit itself to the "Freight Contract" but issued a bill of lading, and, as noted earlier, the "Freight Contract" states that it shall be "[s]ubject to provisions of carrier's bill of lading form currently in use in connection with shipments to destinations named above [i. e., New Haven, Conn.]."[6] If the parties to a traditional voyage charter may agree that the bill of lading shall "regulate [their] relations," this is *a fortiori* so under such a hybrid document as this "Freight

---

4. Indeed, the rule that, as between the parties to a charter party, a bill of lading is a mere receipt and not also part of the contract of carriage, has long been recognized to be a flexible one, i. e., subject to contractual modification by the parties. Thus, in Crenshawe v. Pearce, 37 F. 432, 434 (S.D.N.Y.1889), rev'd on other grounds, 43 F. 803 (C.C.1890), the general rule was stated as follows:

> [I]t has been long settled, not only that the bills of lading do not supersede the provisions of the charter-party in so far · as they differ from it, but that they are controlled by the charter-party, *in the absence of any proof of authority and intention to make a new contract.*

(emphasis added). See also, *e. g.*, The Energia, 66 F. 604, 607 (2 Cir. 1895); Swift & Co. v. Glasgow Steam Shipping Co., 280 F. 910, 912 (S.D.N.Y.1921);

Ministry of Commerce, etc. v. Marine Tankers Corp., 194 F.Supp. 161, 163 (S.D.N.Y.1960).

5. Maritime law would be greatly benefitted if practitioners could adopt some words, like lessor and lessee, that would avoid the ambiguity in the term "charterer."

6. In urging that this provision of the "Freight Contract" is without force in this case, Seaboard argues that since it had previously carried no shipments from Japan to the United States and the bill of lading form used was that of Aall & Co., the form was not the "carrier's bill of lading form currently in use" on this particular route. Since Aall & Co. which issued the bill of lading was the carrier's agent at the port of embarkation, we con· sider Seaboard's argument to be without merit.

Contract" in which Nichimen's substantive position was little different from that of a shipper who had received a bill of lading but had not entered into such a contract. Since the parties made the bill of lading an integral part of the "Freight Contract," COGSA applies and any provisions in the contract of carriage inconsistent with it would be void, § 3(8). Indeed, although we need not decide the point, we have some question whether in a case where a bill of lading or similar document of title was issued under a "Freight Contract" so unlike traditional charter parties,[7] COGSA would not be applicable even in the absence of a "subject" clause; if not, carriers would have discovered a way to create a rather large loophole in the statute.

If we had not come to the conclusion that COGSA applied by the force of its terms, we would have been obliged to consider—and here we must add one fact to the district court's summary—the typewritten provision upon the reverse side of the bill of lading, to which the "Freight Contract" is subject, stating as follows:

> Paramount Clause: The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels at the 25th August, 1924, as enacted in the country of shipment shall apply to this contract. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

Japan enacted legislation "very similar to the Hague Rules" effective January 1, 1958.[8]

The "corresponding legislation of the country of destination" is COGSA.

Little need be said to demonstrate the correctness of the court's conclusion that, Nichimen having made its *prima facie* case, Seaboard and Vigra failed to carry the burden, imposed by § 4(2)(q) of COGSA, of showing freedom from negligence in the stowage of the cargo.[9] There was expert evidence that the cargo in Hold No. 2 should have been lashed down; that it should have been stowed only one tier high and spread over a greater area, rather than piled two tiers high at one end of the hold; that the cargo was secured only by wire rope poorly protected against cutting by edges of the coils; that the wire rope was made fast by turnbuckles with an open hook instead of a shackle at each end, with the consequence that a one-inch slackening in the lashing would al-

7. The specimen voyage and time charters printed in Gilmore & Black, *supra*, at 796–809, are detailed contracts occupying six and eight printed pages, as compared with the one sheet "Freight Contract." While the voyage charterer is a shipper, he is something more. COGSA's reference to charter parties, § 5, must be read in light of the common understanding, expressed in The New York, 93 F. 495, 497 (E.D.N.Y.1899), aff'd 113 F. 810 (2 Cir. 1902), where the court said, "A charter party is a specific contract, by which the owners of a vessel let the entire vessel, or *some principal part* thereof, to another person, to be used by the latter in transportation for his own account, either under their charge or his." (emphasis added). See also Vandewater v. Mills, 60 U.S. (19 How.) 82, 91, 15 L.Ed. 554 (1857).

8. See W. Tetley, Marine Cargo Claims 282–83 (1965). The legislation applies, *inter alia*, to shipments from Japan to a foreign port. However, were it not for our conclusion as to the applicability of COGSA, we would have to consider the Japanese "package" limitation of 100,000 yen, which is lower than COGSA's limitation of $500. See Part IV *infra*.

9. In contrast to the situation under federal bailment law where the burden of persuasion remains throughout on the bailor-shipper, see *supra* & note 1, § 4(2)(q) imposes on the carrier "no mere burden of going forward with the evidence, but a real burden of persuasion, with the attendant risk of non-persuasion," Gilmore & Black, *supra* § 3–37, at 146.

It is not disputed that § 4(2)(q), rather than § 4(2)(a), is the controlling provision. See Gilmore & Black, *supra*, § 3.29, at 135–37.

low unhooking; that the method of lashing in Hold No. 2, with pad eyes secured to the side of the vessel rather than to the after bulkhead as in Hold No. 4 was defective; and that the timber used to shore up the empty space in the first row of coils was not strong enough to hold the cargo. This was quite sufficient to overcome the expressed satisfaction of Nichimen's marine surveyors. The court's finding that the stowing was done by Seaboard rather than by Nichimen's agent is beyond successful attack; in any event, under § 3(2) of COGSA, the carrier's duty to "properly and carefully load . . . [and] stow . . . the goods carried" is non-delegable. As to defendants' further argument that they are not responsible for the damage to the cargo because it was the result of one of the exceptions to liability contained in COGSA, namely, perils of the sea, § 4(2) (c), we find it unnecessary to give detailed consideration to the court's rejection of the testimony of the master that the shifting of the cargo in No. 2 hold was due to a mammoth 60 foot wave, a phenomenon apparently unnoticed by anyone else on the Farland, since "although the loss occurs by a peril of the sea, yet if it might have been avoided by skill and diligence at the time, the carrier is liable." Clark v. Barnwell, 53 U.S. (12 How.) 272, 280, 13 L.Ed. 985 (1851). See also J. Gerber & Co. v. S.S. Sabine Howaldt, 437 F.2d 580, 588–589 (2 Cir. 1971), and Gilmore & Black, *supra*, § 3.22.

### III.

### *Indemnity of Vigra by Seaboard*

The appellants do not dispute that, to whatever extent liability was properly found in favor of Nichimen, both Seaboard and Vigra are responsible to it under § 1(a) of COGSA; since the bill of lading was issued by Seaboard's agent on behalf of the master and the master was appointed by the owner, Vigra, as well as Seaboard, "enter[ed] into a contract of carriage with [the] shipper." However, Seaboard challenges the conclusion that, as between itself and Vigra, it was the party responsible for the improper stowage under clause 8 of the time charter and hence bound to indemnify Vigra and to pay it the withheld charter hire.

In the carriage of goods under a time charter, absent any special provision or circumstance, the duty to load, stow, and discharge cargo—and the consequences for failing to do so properly—fall upon the ship and her owners.[10] This principle is recognized in the admiralty jurisprudence of both America, see, *e. g.*, Munson S.S. Line v. Glasgow Nav. Co., 235 F. 64, 67 (2 Cir. 1916), cert. denied, 243 U.S. 643, 37 S.Ct. 405, 61 L.Ed. 944 (1917), appeal dismissed, 246 U.S. 647, 38 S.Ct. 315, 62 L.Ed. 916 (1918); The Kaupanger, 241 F. 702, 704 (S.D.N.Y.1917); International Drilling Co. v. M/V Doriefs, 291 F.Supp. 479, 487–488 (S.D.Tex.1968), and England, see Canadian Transport Co. v. Court Line, Ltd., [1940] A.C. 934, 943 (Lord Wright). To be sure, stevedores, often under the direction of cargo specialists, rather than the crew frequently load and discharge the cargo. But, without more, use of such additional personnel by a ship, under time charter, to carry out her duties would not relieve her and the owners of responsibility for any consequent cargo damage. Compare Canadian Transport Co. v. Court Line, Ltd., *supra*, [1940] A.C. at 943 (Lord Wright). Yet, as Judge Learned Hand explained while on the district court, the ship's and her owners', "duty depends only upon the presumption from

10. The same principle applies in the context of voyage charters since, as in the case of a time charter, the owner's crew mans and navigates the vessel, see Gilmore & Black, *supra*, § 4–1, at 170, which is the factual premise underlying the responsibility placed upon the owner, see *infra*. The principle does not extend, however, to a demise, or bareboat, charter since there the charterer, takes complete control of the vessel, mans it with his own crew, and is hence treated by the law as owner *pro hac vice*. See *e. g.*, *id*. at 117; Munson S. S. Line v. Glasgow Nav. Co., *supra*, 235 F. at 67.

the original custom, when the ship's crew stowed and discharged; it may, of course, devolve upon the charterer by his assuming it . . ., either before or after the charter party itself." The Kaupanger, *supra,* 241 F. at 704 (citations omitted).

Against this background, the courts have often struggled to determine if responsibility for loading, stowing, and discharging cargo has been shifted to the charterer, either by a charter party provision or by action or custom of the particular parties.[11] Clause 8 which is here at issue specifies in relevant part that the "Charterers are to load, stow, and trim the cargo under the supervision of the Captain . . . ." The time charter is a form approved by the New York Produce Exchange, revised 1946, as modified by the parties, and clause 8 and similar clauses have been the subject of a substantial amount of judicial consideration. See Oxford Paper Co. v. The Nidarholm, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931); Mobile, Miami & Gulf S.S. Co. v. Lake Giltedge S.S. Co., 68 F.2d 370 (5 Cir. 1934); Horn v. Cia de Navegacion Fruco, S.A., 404 F.2d 422, 433 (5 Cir. 1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 444–445 (S.D.N.Y.1948), modified on other grounds, 194 F.2d 449 (2 Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); Isbrandtsen Co. v. S.S. George S. Boutwell, 1958 A.M.C. 351 (S.D.N.Y.1957); Jamos Limitada v S.S. Bernhard Ingelsson, 1963 A.M.C. 1162, 1172–73 (S.D.N.Y. 1963); Luigi Serra, Inc. v. S.S. Francesco C, 1965 A.M.C. 2029, 2037 (S.D. N.Y.1965), aff'd, 379 F.2d 540 (2 Cir. 1967); Interstate Steel Corp. v. S.S. "Crystal Gem," 317 F.Supp. 112, 119 (S.D.N.Y.1970); A/S Brovanor v. Central Gulf Steamship Corp., 323 F.Supp.

1029, 1032 (S.D.N.Y.1970); Canadian Transport Co. v. Court Line, Ltd., *supra.*

Consistent with these decisions, the parties agree—as we think they must—that to some extent clause 8 shifts responsibility for stowage to the charterer; the difficult question is how far. Seaboard appears to make two arguments: (1) that in exercise of the Captain's supervisory responsibilities, he and his mates participated in the stowage of the coils to such an extent as to render the owner primarily liable; and (2) that in performance of the owner's responsibility for the seaworthiness of the vessel, the Captain was obligated to correct any improper stowage where, as is alleged to have been the case here, such improper stowage threatened the seaworthiness and safety of the vessel. We will consider these arguments in reverse order.

Seaboard's second argument is premised on testimony by the Farland's Captain that the breaking loose of the 3 to 9 ton coils could have resulted in the piercing of the ballast tank tops, thereby endangering the vessel—apparently because this would have made her unstable. At first impression, Seaboard's argument is not without attraction. Under the time charter, the owner bears continuing responsibility for the seaworthiness of the vessel. See Gilmore & Black, *supra,* § 4–14, at 204. In performance of this responsibility, the Captain acts on behalf of the owner who "runs and mans the ship," *id.* at 205. It might seem reasonable then that the Captain's failure to correct improper stowage of cargo which poses a threat to the safety of the vessel, should it become unstowed, is the owner's responsibility. It must be remembered, however, that the only issue here is primary liability for cargo damage. In this respect, the position urged by Seaboard would drain too much meaning from clause 8's delegation of responsibility for the cargo to

11. Compare, *e. g.,* The Centurion, 57 F. 412, 413, 415 (S.D.N.Y.1893), rev'd on other grounds, 68 F. 382 (2 Cir.), cert. denied, 163 U.S. 705, 16 S.Ct. 1199, 41 L.Ed. 309 (1895), and The Santona, 152 F. 516, 518 (S.D.N.Y.1907), with Corsar v. J. D. Spreckels & Bros. Co., 141 F. 260, 267 (9 Cir. 1905), and Knohr & Burchard v. Pacific Creosoting Co., 181 F. 856, 858 (W.D.Wash.1910).

the charterer. Many heavy items of cargo can threaten the safety or stability of a ship if they become loose; serious threats to seaworthiness also may be posed by cargo that may cause fire or explosion unless properly stowed. To hold the shipowner primarily responsible in all such cases would effectively undermine the charterer's obligation under clause 8. The charterer's prime responsibility for loading and stowage is not destroyed by the qualification that this shall be "under the supervision of the Captain," a phrase doubtless intended to make plain the master's right to veto a plan that might imperil the seaworthiness of the vessel, see fn. 14 *infra* —not to impose on him a duty, as the owner's agent, to supervise the charterer's stow. Had the stowage in this case been properly designed by the charterer's agent, no damage would have occurred. The primary negligence was of the charterer's agent, and we can discern no valid reason why the charterer should now be allowed to shift the cargo damage to the owner on the theory that the Captain, on behalf of the owner, should have corrected its improper stowage. Rather, under clause 8, the safety of the stowage, insofar as cargo damage [12] is concerned, generally is the primary responsibility of the charterer.[13] *Cf.* The Thomas P. Beal, 11 F.2d 49, 52–53 (3 Cir. 1926).

 This is not to say that under clause 8 the owner may *always* avoid liability for cargo damage vis-à-vis a char-

terer so long as the Captain does not interfere in the stowage process. One essential aspect of seaworthiness is that the vessel must be fit for the purpose intended under the charter party. See, e. g., Oxford Paper Co. v. The Nidarholm, *supra*, 282 U.S. at 685, 51 S.Ct. 266; The Southwark, 191 U.S. 1, 9–12, 24 S.Ct. 1, 48 L.Ed. 65 (1903). If cargo damage were to occur because of some defect in the vessel ·which the Captain had failed to discover and correct, primary liability would rest with the owner; the cause of the damage would not be within the scope of the responsibilities which clause 8 was intended to shift from the owner to the charterer. See, e. g., United States v. S.S. Wabash, 331 F.Supp. 145 (S.D.N.Y.1971). Likewise, if some inherent vice of the vessel would make otherwise proper stowage hazardous and the Captain and owner failed to reveal this to the charterer or his stevedore, we doubt whether clause 8 would relieve the owner of primary liability for cargo damage. Cf. Oxford Paper Co. v. The Nidarholm, *supra*, 282 U.S. at 684, 51 S.Ct. 266.

 Seaboard's first argument, which is premised upon the active involvement of the Captain, and his mates, in the stowage of the coils, requires consideration of the capacity in which the Captain was acting. As we have already seen, when taking action that involves the seaworthiness of the vessel the Captain acts on behalf of the owners.[14]. Under clause 8, though, the Captain is un-

---

12. Whether the charterer would also be responsible for any damage to the *vessel* as a result of improper stowage is a different question which we need not decide here since there was none.

13. In Oxford Paper Co. v. The Nidarholm, *supra*, the Supreme Court declined to decide whether a charter party provision which also specified that the charterers were to "load, stow, and trim the cargo at their expense under the supervision of the captain" relieved the owner of responsibility to the charterer for improper stowage of cargo where only the safety of the cargo was imperiled. We find nothing in that decision contrary to our conclusion here. At most, it suggests that

such a clause would not relieve the owner, through the Captain, of responsibility "for damage to cargo exposed, by bad stowage, to sea perils peculiarly within the specialized knowledge and experience of the master." 282 U.S. at 684–685, 51 S.Ct. at 268.

14. For this reason, we have no doubt that the provision for supervision by the Captain of the charterer's stowage would necessarily be implied, even if it were not expressly stated, in order that the Captain might intervene, on behalf of the owner, in any stowage which might adversely affect the vessel's safety and ability to withstand the perils of the sea. See Canadian Transport Co. v. Court

der the "orders and directions of the Charterers as regards employment and agency." When this provision is considered together with the charterer's further responsibility for stowage under clause 8, it is evident that the Captain may be acting either on behalf of the owner or the charterer when he actively intervenes in the stowage process. Horn v. Cia de Navegacion Fruco, S.A., *supra*, 404 F.2d at 433; cf. The Thomas P. Beal, *supra*, 11 F.2d at 53; The Santona, 152 F. 516, 518 (S.D.N.Y.1907). Whether in any particular case he acts on behalf of the owner or the charterer must be determined by looking to the purpose for which he acts. Cf. The Santona, *supra*, 152 F. at 518. Thus, in light of what has already been said, we think the owner's liability for cargo damage due to improper stowage is limited to instances in which the Captain intervenes in the stowage process to protect the vessel's safety and ability to withstand the perils of the sea; to the extent that he acts merely to protect the cargo, the charterer is responsible.[15] As to this case—and here we must add two further facts to the district judge's statement— while the ship's mates, and occasionally the Captain, were down in the holds observing the stowage of the coils, it does not appear that, with one exception, they actively intervened in the stowage which was directed by the charterer's agent. Insofar as the owner's liability is concerned, such mere observation is consistent with performance, by the Captain and his mates, of its responsibility for the seaworthiness of the vessel itself but, without more, it is not sufficient to render the owner liable. The one exception is that the Captain vetoed a plan that would have included stowage in a third hold, Hold No. 6, because this would have adversely affected the trim of the vessel, certainly an action directed at ensuring the seaworthiness of the vessel itself. There was, however, no evidence either that this action was improper or that it had any causal relation to the damage.[16]

Seaboard argues that even if it is held bound to indemnify Vigra from liability to Nichimen, the liability should not extend to attorneys' fees. We fail to see why. If Seaboard breached its duty to Vigra under clause 8 of the charter, it is bound to make good the expectable consequences of its breach, of which the incurring of attorneys' fees in defending against a claim by Nichimen was surely one. Seaboard's contention that the admiralty recognizes attorneys' fees as recoverable by an indemnitee only in the familiar triangle of the land-based harbor worker *versus* the ship *versus* his employer is sufficiently an-

Line, Ltd., *supra*, [1940] A.C. at 937–38, 944 (Lords Atkin and Wright).

15. This appears to be the same test as that employed by the Fifth Circuit in Horn v. Cia de Navegacion Fruco, S.A., *supra*, 404 F.2d at 433, although we are not certain we would agree with its application to the facts of that case. There the shipowner was deemed to be liable for damage to a load of bananas on the grounds that the vessel was unseaworthy because it was not adequately and competently manned at the beginning of the voyage and because the bananas had not been properly stowed by the Captain and his mate to allow necessary cooling and ventilation, thus affecting the capacity of the ship to transport the delicate cargo in the manner specified by the charter party." Insofar as the owner's liability rested on the improper method of stowage, we have some question wheth-

er, given clause 8, the owner bears responsibility for inability of the vessel to carry the cargo safely not as a result of any defect or vice in the vessel, see *supra*, but only as a result of the method of stowage itself.

16. Seaboard argues that if the stowage had been in three holds instead of two, the height of the stow would have been reduced. While it is true that the coils were stowed two tiers high in Hold No. 2, according to the testimony of the Farland's Captain only about half of the hold was covered with coils. It appears that this was done for Seaboard's convenience in loading lumber in Vancouver, not out of necessity. Additionally, it is of interest that the coils in Hold No. 4 which were lashed to the after bulkhead, rather than to the side bulkheads, did not break loose, although they were tiered three high.

**334**

swered by David Crystal, Inc. v. Cunard Steam-ship Co., 339 F.2d 295, 300 (2 Cir. 1964), cert. denied 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965). See also A/S Brovanor v. Central Gulf Steamship Corp., *supra*, 323 F.Supp. at 1033. In United States v. S.S. Wabash, *supra*, 331 F.Supp. at 148, attorneys' fees were awarded a time charterer in the situation, opposite to that here, where cargo damage had been caused by unseaworthiness for which the owner was responsible.

### IV.

#### *The Package Limitation*

This appeal vindicates our prediction that Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 814 (2 Cir. 1971), would "hardly be the last" case presenting the problem of what constitutes a "package" within § 4(5) of COGSA. Initially the district court rejected the contention of Seaboard and Vigra that each coil constituted a "package", so that liability would be limited to $500 for each of the 142 damaged coils, or $71,000. Upon reargument the court concluded that 87 coils which had been wrapped in burlap constituted "packages" and accordingly reduced the damages from $85,180.87 to $75,353.66. While Nichimen accepts that determination, Seaboard and Vigra press their claim that the 55 unwrapped coils also constituted packages.

The dictionary, a source of interpretation not to be wholly disregarded although by no means controlling, includes within the meaning of packages both "[a] bundle made up for transportation" and "[t]hat in which anything is packed." Webster's New International Dictionary (2d ed. 1960). Black's Law Dictionary (4th ed. 1951) defines "package" as a "bundle put up for transportation or commercial handling; a thing in form to become, as such, an article of merchandise or delivery from hand to hand," also "a thing in form suitable for transportation or handling." In Aluminios Pozuelo Ltd. v. S.S. Navigator,

407 F.2d 152, 155 (2 Cir. 1968), after a careful review of the cases, Judge Moore, this court's principal spokesman on this elusive subject, concluded:

The meaning of "package" which has evolved from the cases can . . be said to define a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods.

Applying this standard, we fail to see why the unwrapped coils were not packages as much as those the customer desired to have enclosed in burlap. Each of the coils consisted of a thin steel sheet which had been rolled, strapped, and tied with steel bands. There had thus been "some packaging preparation for transportation . . . which facilitates handling." Nichimen makes much of the fact that this procedure was useful for warehousing as well as for transportation. But the manufacturer was not making steel simply to keep it in a warehouse; this was only the beginning of a route that would lead, by way of transportation in some form, to the fabricator. Bringing the steel sheets to a ship, loading and unloading, and delivering them to the customer, cf. Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co., 155 F.2d 687 (5 Cir.), cert. denied, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946), would have been a different and presumably a much more difficult process than handling the coils. In short, the fact that the act of rolling and banding facilitates storage does not necessarily negate the possibility that it is also packaging preparation made to facilitate handling in transportation. Nichimen stresses also that its customers ordered "Hot Rolled Steel Sheet in Coils." But this specification of "Coils" too reflected a concern for convenience in delivery and handling. It was the Hot Rolled Steel Sheet which was wanted in the last analysis; no one fabricates steel products from banded

coil itself. More significant is the reference in the Sales Contract between Nichimen and its principal customer, Eastern, to "Packing: Bare but bundled by iron hoop" for coils of plain steel and "Packing: Wrapped by oil paper and hessian cloths" for coils of steel that had been "pickled and oiled." Under the dictionary definitions a "bundle" is a package. Also the bill of lading, under the heading "Number of Packages," stated "280 coils." While the description on the bill of lading is not controlling, Middle East Agency, Inc. v. The John B. Waterman, 86 F.Supp. 487, 491 (S.D. N.Y.1949) it is important evidence of the parties' understanding, see Standard Electrica, S. A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, 375 F.2d 943, 946 (2 Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).

Nichimen argues that our recent decisions have gone far beyond Judge Clark's explanation that the purpose of § 4(5) is "to prevent 'excessive claims in respect of small packages of great value,' but not to permit carriers to escape liability for just claims." Stirnimann v. The San Diego, 148 F.2d 141, 143 (2 Cir. 1945) (citations omitted). We have indeed discerned a further purpose in the statute, namely, as said by Chief Judge Lumbard, to describe "a unit that would be fairly uniform and predictable in size, and one that would provide a common sense standard so that the parties would easily ascertain at the time of contract when additional coverage was needed, place the risk of additional loss upon one or the other, and thus avoid the pains of litigation." Standard Electrica, S. A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft, *supra,* 375 F.2d at 945 (footnote omitted). If Nichimen wanted coverage over $500 per coil, it could either use the statutory alternative of declaring a higher value or cover itself by insurance. Most cargo-damage actions are really battles between insurers, see Leather's Best, Inc. v. S. S. Mormaclynx, *supra,* 451 F.2d at 815,

and there is thus no need for shedding crocodile tears on behalf of the shipper or consignee. The "package" provision in § 4(5) has indeed become unsatisfactory, as we have frequently noted, but, pending a new resolution, courts do best to apply it in light of the parties' probable intention. We have little doubt, in light of the Sales Contract, the bill of lading, and common understanding, that the parties here considered each coil, whether wrapped or unwrapped, to be a "package."

The judgment is modified accordingly, and as so modified, is affirmed. Nichimen may recover two-thirds of its costs and Vigra all its costs against Seaboard.