**NARCISSUS SHIPPING CORPORATION,**
Plaintiff,

v.

**ARMADA REEFERS, LTD., Looza N.V., Port Canaveral Stevedoring, Ltd., Juice Bowl Products, Inc., and Sonoco Plastic Drum, Inc., Defendants.**

No. 94–189–CIV–ORL–18.

United States District Court,
M.D. Florida,
Orlando Division.

Jan. 8, 1997.

Charles G. DeLeo, Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Miami, FL, for Narcissus Shipping Corporation.

Martin L. Lindahl, Underwood, Karcher, Karcher & Anderson, P.A., Miami, FL, John T. Lillis, Jr., Thomas C. Murphy, Kennedy, Lillis, Schmidt & English, New York City, for Juice Bowl Products, Inc., Looza N.V.

John H. Hickey, Hickey & Jones, P.A., Miami, FL, for Port Canaveral Stevedoring, Ltd.

Luis M. O'Naghten, Akerman, Senterfitt & Eidson, Miami, FL, Mark C. Flavin, James H. Hohenstein, Haight, Gardner, Poor & Havens, New York City, for Armada Reefers, Ltd.

Robert E. Warren, Moseley, Warren, Prichard & Parrish, Jacksonville, FL, for Sonoco Plastic Drum, Inc.

## ORDER

G. KENDALL SHARP, District Judge.

Narcissus Shipping Corporation (Narcissus) brought this action in admiralty to recover damages it suffered as a result of the problematic, transatlantic voyage of the motor vessel MERCHANT. Just over one day into the voyage, the vessel experienced a list that could not be corrected at sea. The vessel's Master then guided it to a port of refuge, where the list was remedied to a point that allowed the vessel to return to its port of embarkation. Upon arrival, the cargo was discharged, stored, reloaded, and secured for the voyage to Europe. Narcissus claims that it incurred substantial financial expense because of the deviated voyage. Narcissus's claim gave rise to a series of counterclaims and cross claims, which were tried before the court. Having reviewed the transcript of the proceedings and the evidence of record, the court issues its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

### I. Findings of Fact

#### A. The Parties and Their Relationship

Narcissus is a Liberian company and the bareboat charterer of the MERCHANT, which essentially made Narcissus the vessel's owner. The MERCHANT is a cargo ship constructed in 1991 and equipped to transport refrigerated and frozen cargo. Defendant Armada Reefers, Ltd. (Armada) is a Liberian company that supplies ocean carriage for refrigerated or frozen cargo. On October 15, 1993, Armada entered a time charter with Narcissus, through which Armada chartered the MERCHANT for a period of eleven to thirteen months.

Defendant Looza N.V. (Looza) is a Belgian company which produces and distributes fruit products, including orange juice, throughout Europe and the United States. Defendant Juice Bowl Products, Inc. (Juice Bowl) is a Florida affiliate of Looza, both of which are corporate affiliates of a New Jersey company by the name of ABA Management which is not a party to this litigation. Like Looza, Juice Bowl produces and distrib-

utes orange juice, among other food products, as part of its regular course of business.

On December 23, 1993, Looza entered a voyage charter, or contract of affreightment, with Armada. The contract contemplated at least nine voyages, on each of which a ship of Armada's choosing would carry Juice Bowl's cargo of single-strength frozen orange juice from Port Canaveral, Florida to the port of Flushing in the Netherlands.[1] The MERCHANT was the vessel Armada nominated to carry Juice Bowl's cargo on one of the nine voyages to Flushing scheduled for approximately January 12, 1994.

Looza/Juice Bowl's shipment of orange juice was packed in heavy-duty plastic bags which were then placed inside tapered, thick plastic drums designed to be used in place of traditional fifty-gallon steel drums. Defendant Sonoco Plastic Drum, Inc. (Sonoco) manufactured the plastic drums at the request of Looza/Juice Bowl. Defendant Port Canaveral Stevedoring, Ltd. (PCS) was chosen by Juice Bowl to serve as its state-side stevedore for the MERCHANT loading, for which those two parties entered a stevedoring contract on December 15, 1993.

### B. Events Leading to the Voyage of the MERCHANT

Looza/Juice Bowl had been producing juice products in Florida and shipping them to Europe for several years prior to 1992. During that time, they shipped their product in steel drums traditionally used in ocean carriage. As steel drums occupy the same amount of shipping space whether empty or full, it was not economical to ship the drums back to the United States and reuse them. Thus, Looza/Juice Bowl purchased empty drums for each shipment from the United States. In an effort to reduce shipping costs, Looza/Juice Bowl enlisted Sonoco to design and manufacture heavy-duty, tapered plastic drums that could contain roughly the same amount of product as the traditional steel drums. Because the tapered drums were slightly narrower at the bottom than the top, one drum could be placed, bottom first, into another. Looza/Juice Bowl hoped that they could ship their product to Europe, clean the drums there, and then invert, stack, and ship the drums back to the United States for use on subsequent voyages.[2]

When Looza/Juice Bowl first began using the plastic drums, they placed the filled drums in refrigerated containers and then loaded the containers aboard ships bound for Europe. These voyages were completed without incident. Later, Looza/Juice Bowl believed they could further reduce their shipping costs by abandoning the use of containers and shipping the plastic drums break bulk.[3] Over the course of thirteen voyages in 1993, Looza/Juice Bowl shipped thousands of plastic drums filled with frozen or nearly frozen orange juice, break bulk, to Europe. However, each of the thirteen voyages in 1993 involved cargo loads of both steel and plastic drums.

The first voyage in 1993 was that of the motor vessel PRINCESSA. On that voyage, the vessel's side shoring collapsed as did the stow of the cargo causing a list.[4] Because of

1. Under the voyage charter, or contract of affreightment, Juice Bowl is technically the stateside shipper of the cargo and Looza the European consignee. As a practical matter for this litigation, however, Looza and Juice Bowl are one and the same. The record evidence clearly demonstrates that one entity rarely, if ever in this case, acted without consent of the other. They were represented jointly at trial and, in fact, stipulated that the entities were so closely related that they could rightfully be referred to interchangeably. Thus, beyond making this technical distinction in reference to the voyage charter, the court will hereafter refer to the parties as "Looza/Juice Bowl."

2. The ability to stack the empty drums one into another was central to Looza/Juice Bowl's plan to be able to economically reuse the drums. The characteristic allowed the empty drums to occupy only a fraction of the cargo space needed to carry the drums full. Thus, the cost of shipping the empty drums back to the United States would not be nearly as high as it would have been for steel drums.

3. The term break bulk refers to the method of stowing cargo directly in the holds of the carrying vessel without the benefit of intermediate containers.

4. Side shoring refers to timber or pipe fencing fitted to the interior of a cargo ship's holds to make any flared portion of the hold "square" and to confine the cargo to that square space.

incidents like this, Looza/Juice Bowl and Sonoco began discussing ways to prevent similar episodes. In February of 1993, the Sonoco representatives told Looza/Juice Bowl that the problems experienced on the PRINCESSA could be resolved by utilizing reusable pallets to confine the bases of the plastic drums. However, the use of such pallets would reduce the ship's cargo capacity by sixteen to seventeen percent. The palletization concept was rejected by Looza/Juice Bowl for that reason and because of the cost of the pallets. Consequently, they continued break-bulk shipping combination loads of steel and plastic drums on various ships throughout the balance of 1993.

Serious problems similar to those experienced aboard the PRINCESSA were experienced on other vessels carrying Looza/Juice Bowl's cargo in 1993. In the summer of 1993, one vessel experienced a cargo shift and resulting list so significant that an experienced marine surveyor, Captain Jacques van Havre, opined that the vessel and her cargo could easily have been lost. In his report dated June 10, 1993, Captain van Havre also counseled that palletization was required if the drums were to be safely carried break bulk, and that failure to palletize would result in a continued "high level of risk." Looza/Juice Bowl received Captain van Havre's report, which was prepared at the behest of Looza/Juice Bowl's cargo insurer, on the same day it was rendered.

The record in this case is replete with evidence that Looza/Juice Bowl knew that break bulk shipments of its drums apparently had a propensity to shift during ocean transport. They also knew of the concern expressed by many learned mariners over the danger and possible consequences of such shifts. Nevertheless, Looza/Juice Bowl refused to incur any additional expense to better secure their break bulk shipments aboard the various ships that carried the drums. More importantly, the record demonstrates Looza/Juice Bowl's reluctance to warn others about the previous problems with break bulk shipments of their drums. Because of Looza/Juice Bowl's refusal to palletize the drums, as suggested by their marine insurance carrier's surveyor Captain

van Havre, Looza's cargo insurance policy covering the drums and contents was canceled on approximately June 17, 1993.

When Looza went in search of a new cargo insurance policy, the potential insurer required that a special packing survey be performed on the drums. The survey was conducted on June 18, 1993 and the insurer's surveyor, much like Captain van Havre, concluded that the drums were not suitable for break bulk shipment without palletization. Looza/Juice Bowl resisted and was not covered through that insurer.

During mid–1993, Sonoco representatives participated in discussions with Looza/Juice Bowl concerning the shifting problems that occurred earlier in the year. In documents generated during the discussions, Sonoco representatives state that palletization was considered by Looza/Juice Bowl but was not favored because it was "very expensive." Sonoco's Technical Services Department then indicated that it would work to uncover some "low cost options" that may be adaptable to break bulk shipment. Even though Looza/Juice Bowl rejected the idea, Sonoco tested a palletization system with good results, which they reported to Looza/Juice Bowl. Throughout the summer of 1993, representatives of Sonoco and Looza/Juice Bowl met to try and develop a mutually acceptable and effective solution to the shifting problem. The record convinces the court that keeping shipping costs low was of unparalleled importance to Looza/Juice Bowl.

In late July or early August of 1993, Looza/Juice Bowl secured a new policy of cargo insurance through a company by the name of Pandi Marine. The testimony and correspondence concerning the relationship between Pandi Marine and Looza/Juice Bowl indicates that Pandi Marine was not made completely aware of the prior shifting problems.

The shifting problems persisted through late 1993. On two voyages of the motor vessel MAGIC, carrying Looza/Juice Bowl's cargo, shifting problems occurred. A Looza/Juice Bowl manager, Dirk Becquart, reported that on the MAGIC's September 9, 1993 voyage, the vessel arrived in Flushing with a five-degree list. He also confirmed

that the theory of surrounding the plastic drums with the steel drums to stop the shifting had been unsuccessful. On October 22, 1993, the MAGIC again departed Port Canaveral carrying Looza/Juice Bowl's cargo and experienced similar problems which were reported by Becquart to Looza/Juice Bowl officials.

The worst instance of the drums shifting occurred aboard the motor vessel ANTARCTIC after it departed Port Canaveral on December 10, 1993. The vessel arrived in Flushing on December 23, 1993 with a list so serious that it moved Captain van Havre to conclude that continued break bulk carriage of the drums was destined for disaster. Captain van Havre's report on the ANTARCTIC voyage was dated January 4, 1994. The preponderance of the evidence supports a finding that Looza/Juice Bowl officials knew of Captain van Havre's report on the ANTARCTIC before the loading of the MERCHANT took place. Further, Looza/Juice Bowl's Dirk Becquart produced a report on the ANTARCTIC and reported that it arrived in Flushing with a list of twelve degrees, and that the Dutch maritime authorities deemed the drums unseaworthy for carriage on Dutch vessels.

An important element of the ANTARCTIC incident was that the ANTARCTIC was equipped with side shoring very similar to that with which the MERCHANT was fitted.[5] Tellingly, the state-side stevedore for the ANTARCTIC voyage claimed that the stow of the drums on the ANTARCTIC was the tightest, most secure stow of all the vessels it loaded for Looza/Juice Bowl in 1993. Thus, Looza/Juice Bowl was aware that even with what was considered the best stow of thirteen attempts, their break bulk cargo was still problematic and dangerous.

The concern over the safety of carrying the drums break bulk was wide-spread among those who knew of the prior problems. Wolfgang Jobmann, the company which had arranged carriage for Looza/Juice Bowl's cargo throughout 1993, advised them that it would no longer do so because it was not fit for break bulk reefer carriage.[6] Jobmann's decision to no longer arrange carriage for Looza/Juice Bowl's cargo was not devastating to Looza/Juice Bowl because they had preliminarily determined that even more money could be saved by contracting directly with the carriers as opposed to using an intermediary like Jobmann. Looza eventually contracted directly with Armada to carry the cargo of drums in 1994. At roughly the same time, Looza/Juice Bowl contracted with PCS for state-side stevedoring services. The voyage of the MERCHANT was the first encounter for Armada and PCS with the plastic drums at issue in this case.

## C. Armada's Contract With Looza

The contract of affreightment between Looza and Armada was entered on December 23, 1993. Clause fifteen of the contract provided for Armada's freight rate based upon FIOST terms, meaning the cargo would be loaded aboard the nominated vessel "free in, out, stowed, and trimmed." As such, Looza/Juice Bowl assumed the duty, expense, and risk of packing, loading, stowing, and securing the cargo. To help accomplish these tasks, Looza/Juice Bowl hired PCS to perform stevedoring services in Port Canaveral. Personnel from PCS, Looza/Juice Bowl, and Sonoco all worked to develop feasible plans for loading and securing the cargo load of drums. In coordinating their collective efforts for loading and transporting the cargo of juice, Looza/Juice Bowl's Bijan Movahedi made it clear that the cost of securing

---

**5.** The court credits the testimony of experienced marine surveyor Captain James Hughes for the fact that the side shoring on the ANTARCTIC was very similar to that with which the MERCHANT was equipped.

**6.** Although some evidence at trial suggested that Jobmann announced the refusal to carry Looza/Juice Bowl's cargo in 1994 only after learning that Looza/Juice Bowl had decided not to renew his contract for 1994, the court is persuaded

otherwise. Looza/Juice Bowl contended that Jobmann's decision should not support a finding that there was a problem with the drums because other carriers, like Armada, were interested in Looza/Juice Bowl's business. The court concludes as a matter of fact that the other carriers who expressed interest had no knowledge of the prior shifting problems and, therefore, had no reason not to be interested in Looza/Juice Bowl's business.

materials was an area targeted for stringent cost control.

On December 30, 1993, Armada sent the MERCHANT's Master his voyage instructions, which also included a description of the cargo to be loaded in Port Canaveral. Armada also informed the Master of the FIOST terms of carriage and the dimensions of the drums. After learning the dimensions and weight of the drums and the fact that they were going to be loaded in two tiers, break bulk, within the ship's holds, the Master elected to erect "side boards," and informed Narcissus and Armada of his decision to do so.[7]

On January 3, 1994, Armada was informed that Looza's stevedore in Port Canaveral wanted to screw wooden dunnage to the deck grating of the ship's holds to prevent the drum bottoms from shifting. On January 4, 1994, Armada advised the Master of the stevedore's intent. In informing the Master, Armada proved ignorant of the prior shifting problems when it stated "as we see it, in case the vessel is fully laden cargo should not be able to shift." The Master also found the stevedore's intention odd. In the transmission to the Master, however, Armada indicated that "some shifting" had occurred previously. Notwithstanding the latter, the court is convinced by the totality of the record evidence that Looza/Juice Bowl had superior knowledge about the prior shifting incidents and withheld much of the details of those incidents when dealing with Armada, thereby confining Armada to vague knowledge that "some shifting" had previously occurred. Armada provided what limited information it had to the Master of the MERCHANT who was then able to relate the information to Narcissus and its agents.

A Dutch stevedore, Guus Verhagen, also mentioned the prior shifting problems to Armada's Carsten Hansen. However, the court cannot conclude that Verhagen's statements gave Armada any better notice of the prior shifting than did the discussions with Looza/Juice Bowl. Verhagen told Hansen that there had been a listing incident in 1993. But Verhagen's testimony is undercut by his admission, when asked whether he told Hansen the list was caused by a shift in the cargo, that he "didn't put it so straight." The usefulness to Armada of Verhagen's alleged statement to Hansen is further weakened by the fact that Hansen was simply Armada's charter manager and not an employee charged with overseeing the technical operations on Armada's nominated vessels.

In early January of 1994, PCS and Looza/Juice Bowl were still discussing the manner in which the cargo would be loaded; Armada and Narcissus were not part of these discussions. When Looza/Juice Bowl first engaged PCS as its stevedore, Pat Lee, one of the principals of PCS, had already developed a plan by which such drums could be loaded break bulk. He planned to compartmentalize the ship's holds by using wooden pallets to contain the bottoms of the drums, steel cables, and air bags to fill any voids in the stow. The pallets Lee proposed would have cost twenty-four dollars each.[8] Looza and Juice Bowl rejected this plan for securing the cargo as too costly. This plan would have cost approximately $75,000 and would have reduced the cargo capacity by sixteen or seventeen percent.

Lee then proposed an alternative plan. He recommended the use of nylon straps to secure the drums within the ship's hold. This proposal, which would have cost approximately $20,000, was also rejected as too expensive. Although Looza/Juice Bowl's Bijan and Iradj Movahedi testified that they did not reject these various proposals because of cost, the court credits the testimony of Pat Lee and Jeff Allen, of PCS, and finds that the proposals were rejected as too costly.

### D. The M/V MERCHANT

The MERCHANT arrived at Port Canaveral on January 9, 1994 to receive its cargo of

---

7. The "side boards" to which the Master referred have also been referred to as "side shoring" and "pipe stanchions" in the instant case. As was later learned, the "side boards" of which the Master spoke were a portable system of pipes which, when erected, fit into sockets fastened by nails to the deck grating and the overhead in the MERCHANT's holds.

8. All monetary amounts listed in this order are stated in United States dollars.

no less than 14,000 plastic drums of frozen, or almost frozen, single-strength orange juice. The vessel arrived with its pipe stanchions already erected in her cargo holds. Loading began on January 10, 1994. Prior to loading, the Master met with Pat Lee who outlined the method of loading to be used, including his plan to screw two-by-six wooden dunnage to the deck grating of the vessel's holds to secure the drum bottoms. With the exception of changing the two-by-six dunnage to two-by-four and changing the placement of the dunnage, the Master agreed to the stow plan developed by PCS and Looza/Juice Bowl.

The loading then commenced with the Master and his crew supervising, and with Bijan and Iradj Movahedi as well as Dirk Becquart of Looza/Juice Bowl in attendance. While Carsten Hansen, of Armada, was also in Port Canaveral, he did not supervise or take part in the loading because he was there on an unrelated marketing trip which only happened to coincide with the MERCHANT loading. The loading was completed on January 12, 1994, and the vessel departed for Flushing under normal weather conditions in the early morning hours of January 13, 1994. After getting under way, the Master advised Columbia Ship Management that "as everybody concern was shifting of the cargo which occur in past, taking route to Flushing via South Azores." Thus, the Master was aware, as he testified, that some shifting had occurred in the past. Because the Master was aware of the concerns over prior shifting and knew the number, weight, and configuration of the drums before erecting the stanchions, the court can only infer that the Master intended the vessel's pipe stanchions to restrain the cargo of drums during the routine cargo movement which inevitably occurs in winter-time transatlantic carriage.

The Master testified that at approximately 10:30 a.m. on January 14, 1994, the vessel began to roll nearly thirty degrees to port with little or no corresponding roll to star-board. At about the same time, the Master and Chief Mate inspected all nine cargo holds. In the square holds without pipe stanchions, the drums remained in two tiers as loaded but were leaning at an angle against the port side wall of the hold. In the spaces where pipe stanchions had been erected to square the hold, approximately 80 percent of the port-side stanchions had collapsed under the weight of the drums as they moved in accordance with the vessel's routine rolling. The Master confirmed that a significant spacial gap exists between the stanchions and the interior skin of the ship, especially in the holds where the ship's skin was most flared. When the stanchions collapsed, the drums were strewn throughout the port side gaps creating a list of twelve to fourteen degrees. By 4:00 p.m. on January 14, 1994, all remaining port-side stanchions had collapsed. Had the stanchions not collapsed, the vessel would have experienced a list of only 3.5 to 3.8 degrees.[9]

The Master then determined it was in the best interest of the venture to seek refuge at a port in Bermuda. The MERCHANT arrived at St. George's harbor in Bermuda on January 15, 1994. Finding that the port in Bermuda was inadequate to effect the discharge, cold store, and restow of the cargo, measures were taken to reduce the list to four degrees so that the MERCHANT could return to Port Canaveral. There was trial testimony sufficient to convince the court that the measures taken in Bermuda to right the vessel were as potentially hazardous as the list itself.[10] At this point, the court makes special mention of the abundant record of communication traffic in the instant case. It seems a simple telex or other communication to the port in Bermuda or to interested parties familiar with the port would have quickly revealed the inadequacy of Bermuda's port and allowed the MERCHANT to return to Port Canaveral directly, where the necessary corrective measures could have been performed at a substantial

9. The court credits the testimony of Joseph Winer for this proposition.

10. In Bermuda, containers were placed on the starboard side of the MERCHANT's weather deck and filled with gravel and water to counter-act the port-side list. At least one expert testified that doing so would have been unquestionably catastrophic had the cargo shifted as quickly back to the starboard in the holds as it had done to create the port-side list originally.

savings to the venture. Thus, while the choice to proceed to Bermuda was one well within the Master's discretion, Narcissus is responsible to the other interested parties for that choice.

The MERCHANT returned to Port Canaveral on January 29, 1994 and was in port for just over two weeks during which time its cargo was unloaded and stored while special measures were taken to secure the cargo for the trip to Flushing.[11] Among the measures taken was palletization of the cargo, and more importantly, the construction of a wooden fence on the inboard side of the pipe stanchions. The wooden fence was braced against the structural supports for the skin of the ship. The fence was designed to contain the drums when routine movement in the cargo occurred. With these precautions having been taken, the MERCHANT made its crossing to Flushing without incident. The balance of the 1994 voyages under Armada's contract with Looza/Juice Bowl were performed with almost exclusively palletized cargo on each vessel. Those voyages were completed without any shifting problems.

After hearing all of the testimony at trial and reviewing the evidence of record, the court concludes as a matter of fact that forty percent of the fault in this case is attributable to Looza/Juice Bowl for their unwillingness to pay for adequate securing materials and for their failure to overtly inform the other interested parties to this venture of the many problematic voyages in 1993 on which their cargo was carried. Looza/Juice Bowl also failed to inform the others that little or nothing had been effective in restraining a break bulk shipment of their drums on those voyages. The court finds that the remaining sixty percent of fault is attributable to Narcissus by way of the Master's decision to erect the vessel's pipe shoring to restrain the drums, and his decision to proceed to Bermuda when that port was inadequate to store the cargo during the required restow.

11. While Looza/Juice Bowl claim that some of the plastic drums were damaged, the court specifically notes that no evidence was presented to suggest the cargo itself was damaged.

## II. Procedural History and Posture

The factual scenario set forth above moved Narcissus to file the instant action to recover the money it spent to right the vessel in Bermuda, return it to Florida, unload and reload the vessel, and for damages associated with the vessel's delay in reaching Flushing. Narcissus's claim against Armada, Looza, Juice Bowl, PCS, and Sonoco gave rise to abundant counterclaims and cross claims. The case was tried before the court in admiralty from June 3, 1996 through June 11, 1996. At the close of Narcissus's case in chief, the parties stipulated to a settlement of all claims involving Sonoco with each party bearing its own costs and fees. At the close of all the evidence, the court granted PCS's renewed motion for judgment as a matter of law. Hence this order resolves only the claims between Narcissus, Armada, Looza, and Juice Bowl, each of which will be addressed in turn.

## III. Conclusions of Law

### A. Narcissus's Claims Against Armada, Looza, and Juice Bowl

#### 1. Narcissus v. Armada

■ Narcissus advanced two claims against Armada. First is a claim for unpaid charter hire in the amount of $172,663.98 which Armada withheld and placed in joint escrow, relying upon Clause 11(B) of the charter party between itself and Narcissus. Clause 11(B) of the charter party, as modified by the parties, provides that:

In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars or suffering an accident to her cargo, any detention of the Vessel and/or expenses resulting from such detention to be for the Charterers' account *unless* such detention and/or expenses, or the cause by reason of which either is incurred, be due to, or be contributed to by, the negligence of the Owners' servants (emphasis added).[12]

12. The charter party between Narcissus and Armada is based upon the Baltime Form time charter party. It is critical to note the effect of the negotiated language in this modified Baltime charter party as compared with a charter party relying strictly on the standard language of the

As a matter of fact, the court finds that the incident, which occurred aboard the MERCHANT and sent the drums into disarray causing the list, constitutes an "accident to her cargo" as envisioned by Clause 11(B) of the charter party between Narcissus and Armada. As such, any detention or expenses related to the accident to cargo are for the account of the charterer, in this case Armada, unless the detention or expenses associated therewith or "the cause by reason of which either is incurred" be caused by or contributed to by the negligence of the Owner's, in this case Narcissus's, servants. Narcissus's most important servant in the case at bar was the Master of the MERCHANT. The court finds that the Master's negligence contributed significantly to the events which created the list that drove the MERCHANT to seek refuge.

At trial, the Master testified that the ship's pipe side stanchions are used to "square" the ship's cargo holds in the areas where the flare of the ship's skin creates a less than square hold. The Master did not erect the pipe side stanchions until after he was notified of the type, amount, weight, and dimensions of the cargo he was to carry from Port Canaveral to Flushing. The only inference that can be drawn by the Master's decision to erect the pipe stanchions and the timing of same is that the Master intended the pipe stanchions to contain the break bulk cargo of drums he was to carry.

As the stanchions aboard the MERCHANT had been customarily used to contain lighter palletized fruit cargo in the past, the stanchions failed under the weight of the markedly heavier drummed cargo of frozen juice. The court holds that the Master of the MERCHANT was negligent in erecting the insubstantial pipe stanchions with the expectation that they constrain the two-tiered cargo of 400–pound drums. Further, because the stanchions, although portable, are part of the ship's permanent store of equipment, the court finds that their use under the circumstances described above were in dereliction of the Master's duty to exercise due diligence to make the MERCHANT seaworthy when it left Port Canaveral. *See Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 467 (5th Cir. 1976) (holding that inadequate equipment can give rise to a finding of unseaworthiness); *accord Texaco, Inc. v. Universal Marine, Inc.*, 400 F.Supp. 311, 320 (E.D.La.1975); *see also Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422, 428–29 (5th Cir.1968) (holding that shipowner owes duty of due diligence to make vessel seaworthy at the outset of the voyage). Thus, both the negligence of the Master in erecting the pipe stanchions and the resulting unseaworthiness of the vessel are attributable to Narcissus on the instant facts. Because of the Master's negligence and because the MERCHANT was not seaworthy when she left Port Canaveral, Narcissus's claim for hire against Armada fails.[13]

■ Narcissus's second claim against Armada is for breach of Clause 4 of the charter party relating to Armada's obligations to load, trim, and stow the cargo. In pertinent part, Clause 4 of the charter party provides that "[w]hilst on hire, Charterers ... to arrange and pay for loading, trimming, stowing (including dunnage board), unloading, weigh-

Baltime Form. In an unmodified charter party on the Baltime Form, Clause 11(B) reads "... such detention to be for the Charterers' account *even if* such detention and/or expenses, or the cause by reason of which either is incurred, be due to, or be contributed to by, the negligence of the Owners' servants." *See generally* Michael Wilford, et al., Time Charters, at 554–55 (1995) (emphasis added). By negotiating the modification of the standard language of "even if" to "unless", Armada effectively expanded the grounds for which it would not be responsible for hire. Normally, the negligence of Master or crew would not effect the hire due under Clause 11(B) so long as the ship was capable of complying with its duties under the time charter. *Id.* at 363. However, the word "unless" brings any negligence by the Master or crew which hinders performance back into the realm of occurrences that may preclude the charterer's duty to pay hire.

13. While not addressed by the parties, the court also notes that Clauses 11(A) and 41 weigh in Armada's favor on Narcissus's claim for pending hire to the extent that the choice to deviate to Bermuda constitutes a "necessary measure to maintain the efficiency of the vessel," for which, under the plain wording of Clause 11(A), no hire is to be paid in respect to any time lost. The time lost is the time for which Narcissus now seeks its hire. As such, Narcissus's claim would be untenable under Clause 11(A) as well as under 11(B).

ing, tallying and delivery of cargoes...." Clause 13 of the charter party adds that "[t]he cargo [is] to be loaded, stowed and discharged under the Master's supervision." While the parties make much of what these clauses might mean when read together, the court finds no impediment to giving the clauses their plain meaning to arrive at the same result: Armada contractually assumed the practical and financial obligation to load, trim, stow, and discharge the cargo under the supervision (but not responsibility) of the Master of the nominated vessel. *See Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 332 (2d Cir.1972) (interpreting similar language).

Further, implicit in accepting the obligation comes the responsibility of performing the contractually undertaken duties with due care. *See Canadian Transp. v. Court Line, Ltd.,* [1940] A.C. 934, 951–52 (Lord Wright). The fate of the MERCHANT and the condition of her cargo upon arrival in Bermuda signals a breach of Armada's contractual duty of due care in loading and securing the cargo. Accordingly, the court holds Armada liable to Narcissus under Clause 4 of the charter party in the amount of $732,527.19.[14]

### 2. Narcissus v. Looza and Juice Bowl

 Narcissus's claim against Looza and Juice Bowl sounds in tort and asserts that they were negligent in withholding the wealth of information they had about prior shifting problems and the many steps taken to eradicate the shifting which proved ineffective. The maritime law recognizes a shipper's duty to inform other interested parties in a maritime venture of dangerous propensities of its cargo, when the propensities are not open and obvious. *Ionmar Compania Naviera, S.A. v. Olin Corp.,* 666 F.2d 897, 904 (5th Cir.1982). This is not to say that anyone in this case knew exactly what was causing the problem with the plastic drums of frozen juice. What is certain though was that Looza and Juice Bowl were the only entities who were parties to each of the problematic voyages of 1993 and without question knew that little or nothing had worked to effectively secure this cargo in the past. Looza and Juice Bowl were also privy to the reasoned opinions of several experienced marine surveyors who told them unequivocally that their cargo was not safe to ship break bulk unless it was palletized and compartmentalized. The court has determined that Looza/Juice Bowl consciously rejected the remedies proposed by the surveyors because they deemed the solutions too expensive. The court has further concluded that Looza/Juice Bowl must be held financially accountable for that conscious decision, as well as their decision not to overtly inform Narcissus, its Master, or Armada of the extent of the prior shifting and resulting lists.

The Master of the MERCHANT testified that he knew that some shifting had occurred but that the vessels had all completed their voyages. He further testified that lists of up to five degrees, while not desirable, were tolerable to him. However, the court is convinced that Armada, Narcissus, and the Master were unaware of the near catastrophic degree of some of the prior lists. Had any of these parties known the true extent of the prior problems and the suggested solutions, this voyage and resulting damages could have, on the facts before this court, been avoided. *Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation Inc.,* 774 F.2d 648, 655 (4th Cir.1984). Inasmuch as Looza and Juice Bowl were the only parties with this knowledge and failed to share it, the court finds that Looza and Juice Bowl breached their duty to inform the other interested parties to the venture, especially Narcissus and Armada. Narcissus claims compensatory damages against Looza and Juice Bowl jointly and severally in the amount of $905,191.17.[15] As the court has

---

14. Narcissus's total compensatory damages in this case are $905,191.17, including $172,663.98 for pending hire. *See infra* note 15. As the court has denied Narcissus's claim for hire, the most Narcissus can recover from Armada pursuant to its claim under Clause 4 of the charter party is $732,527.19.

15. Exhibit 421 is Narcissus's detailed statement of damages in this case. In that exhibit Narcissus claimed total compensatory damages of $998,408.97, excluding attorneys' fees and costs. At trial, Narcissus voluntarily withdrew as improper items 128, 129, and 130 of item "G" in the statement of damages. Further, because the court found that certain items were duplicated in

determined that Looza and Juice Bowl's withholding of valuable information about prior shifting and unwillingness to pay for more adequate securing materials accounted for forty percent of Narcissus's damages, the court awards Narcissus $362,076.46 which represents forty percent of the compensatory damages Narcissus seeks from Looza and Juice Bowl jointly and severally.

### B. Counterclaims by Armada and Looza/Juice Bowl

#### 1. Armada v. Narcissus

■ In its counterclaim, Armada contends that Narcissus breached the time charter party between them by either failing to exercise due diligence in providing a seaworthy vessel, or through the negligence of the MERCHANT's Master and crew in supervising and approving the loading and stowing of the cargo. In support of the negligence theory, Armada argues that "Narcissus at all material times was responsible for the loading, stowing, and discharge of cargo carried on board the Vessel which actions were to be done under the supervision of the master of the Vessel." (Doc. 23 at ¶ 24.) Contrary to Armada's assertion, the court in Section III(A)(1) of this order found that Armada as charterer was charged under the charter party with the responsibility to load, stow, and discharge the cargo and that the same was to be done under the supervision of the Master. The clause requiring the Master's supervision merely bound the parties overtly to what is always implicitly true: the Master retains the right to supervise any operations aboard the vessel to ensure that the same do not adversely affect the seaworthiness of the vessel. *E.g., Nichimen,* 462 F.2d at 332. Hence, the clause does not saddle the owner with the responsibility to load, stow, and discharge the cargo as Armada suggests. *Id.* Thus, Armada's counterclaim fails when

predicated upon a perceived breach by Narcissus of the duties associated with loading and securing cargo.

■ However, Armada also claims that Narcissus breached the charter party by providing an unseaworthy ship. The duty to provide a seaworthy vessel requires an owner to exercise due diligence to provide a seaworthy vessel at the beginning of the voyage. *Horn,* 404 F.2d at 428–29. This duty implicates not only the ship itself but also the adequacy of the ship's equipment. *Martinez,* 529 F.2d at 467. The problematic equipment in the instant case was the ship's side stanchions or pipe shoring materials the Master attempted to utilize to restrain the cargo. While the pipe shoring may have been appropriate for other types of cargo, it proved woefully inadequate to restrain 400-pound drums of frozen juice, stacked two high. A vessel's seaworthiness is compromised not only when its equipment is objectively defective but also when otherwise acceptable equipment is consciously used for a purpose for which it is patently inadequate. The latter occurred aboard the MERCHANT, rendering her unseaworthy on the facts and evidence established at trial. Hence, the court finds merit in Armada's contention that Narcissus breached Clause 13 of the charter party in that the use of the stanchions in an attempt to restrain the drummed, break-bulk cargo constituted a lapse in "due diligence on the part of the Owners or their Manager [the Master] in making the vessel seaworthy and fitted for the voyage...." Consequently, the court finds Narcissus liable on Armada's counterclaim and awards Armada the $285,492.05 it claimed and substantiated for loss of hire, loss of profits, related bunkers, and costs of attendance.

computing the damages, the court adjusted the total accordingly. Specifically, the court found that all entries under Item K, with the exception of the Dutch protection and indemnity expenses and the expenses of Captain van Havre, were previously included under Items 158(H) and 137–38(G). The court also found that the $8,246.00 entry in Item "L" had been included as item 134(G). The court further concluded that entries 154 and 155 (for deposition ex-

penses) of Item "H" were improperly included as part of damages and were, therefore, excluded. Finally, entries 156 and 157 of Item "H" are not proper elements of Narcissus's damages in this case and are more appropriately cast as general business expenses unrelated to this incident specifically. Adjustment for these items brings Narcissus's recoverable compensatory damages to $905,191.17.

## 2. Looza v. Narcissus

Looza has stated a counterclaim against Narcissus on a seaworthiness theory. As stated above, and without restating the reasoning again, the court has concluded that the MERCHANT sailed from Port Canaveral in an unseaworthy condition by virtue of the Master's use of pipe shoring as a˙ restraint for the drummed cargo. Looza/Juice Bowl and Narcissus are the two parties between whom the court apportions all of the fault for the damages suffered by the various parties to this case. Based upon the facts established at trial and the inferences reasonably drawn from the facts, the court has apportioned sixty percent of the fault to Narcissus for the actions of the Master in erecting the pipe stanchions to restrain this particular cargo, and for his decision to seek refuge in Bermuda. The court apportioned the remaining forty percent to Looza/Juice Bowl for unreasonably withholding information that only they had regarding previous problems with shipments of their drums and for refusing to pay for more adequate securing materials in light of what was known about the fate of the prior shipments. In accordance with the apportioned degrees of fault, the court finds for Looza on its counterclaim against Narcissus, but only for sixty percent of the $274,139.79 they claim in damages from Narcissus.[16] Thus, Narcissus is liable to Looza in the amount of $164,483.87.

## C. Cross Claims Between Armada, Looza, and Juice Bowl

The only cross claims yet to be decided in this case involve Armada, Looza, and Juice Bowl. Portions of the cross claims between Armada and Looza are predicated upon alleged breaches of the contract of affreightment which governed their relationship. While the Carriage of Goods by Sea Act (COGSA) [17] would normally not apply to this contract, the parties negotiated for its application by including a U.S.A. Clause Paramount in Clause 34 of the charter party. See 46 U.S.C.App. § 1305 (1994) (providing that COGSA does not apply to charter parties); accord Shell Oil Company v. M/T Gilda, 790 F.2d 1209, 1212 (5th Cir.1986); see also Sun Company, Inc. v. S.S. Overseas Arctic, 27 F.3d 1104, 1108 (5th Cir.1994) (recognizing that inclusion of a U.S.A. Clause Paramount evidences intent to incorporate the entirety of COGSA into a charter party); Louis Dreyfus Corporation v. 27,946 Long Tons of Corn, 830 F.2d 1321, 1325 (5th Cir.1987) (same).

▮ Had cargo damage been suffered because of the list in the instant case, COGSA would control the rights and responsibilities of the parties. Insurance Co. of N. Am. v. M/V Frio Brazil, 729 F.Supp. 826, 832 (M.D.Fla.1990) (Sharp, J.). However, absent cargo damage, COGSA does not govern the parties' dispute. COGSA applies to physical loss or damage to the cargo itself; detention or delay is "wholly unconnected with physical loss or damage to [cargo]" and is outside the scope of COGSA. Hellenic Lines Ltd. v. Embassy of Pakistan, 467 F.2d 1150, 1156 (2d Cir.1972); see also F.J. Walker, Ltd. v. M/V Lemoncore, 561 F.2d 1138, 1145 (5th Cir.1977) (discussing Hellenic). Instead, disputes over detention or delay are "left to be dealt with by contract between the parties." Hellenic, 467 F.2d at 1156. The contract of affreightment between Armada and Looza clearly outlines the rights and responsibilities of each party.

## 1. Looza v. Armada

In its cross claim against Armada, Looza advances a claim for indemnity or contribution based upon the contract of affreightment. Looza claims that Armada breached Clauses 25, 27, and 42 of the contract of affreightment. After reviewing those clauses in conjunction with the balance of the contract of affreightment and the testimony at trial, the court finds that Armada did not breach the contract of affreightment as alleged by Looza or in any respect.

16. Looza/Juice Bowl claim total damages in the amount of $517,139.79. However, $243,000 of the total is only recoverable pursuant to Clause 50 of the contract of affreightment between Looza and Armada. Thus, the $274,139.79 represents the total damages for which Narcissus may be liable to Looza.

17. Codified at 46 U.S.C.App. §§ 1300–1315 (1994).

Clause 2 of the contract provides that Armada is "responsible for ... delay in delivery of the goods only in case the ... delay has been caused by the improper or negligent stowage of the goods (*unless* stowage performed by shippers/charterers or their stevedores or servants)" (emphasis added). Looza undisputedly agreed to FIOST terms pursuant to Clause 5(b). That clause provides that "[t]he cargo shall be brought into the holds, loaded, stowed, and/or trimmed and taken from the holds and discharged by the Charterers [Looza] or their agents, free of any risk, liability, and expense whatsoever to the owners." Armada personnel testified at trial that Looza would never have been able to secure a freight rate as low as that reflected in Clause 13 of the contract of affreightment had Looza not agreed to accept the responsibilities set forth in Clause 5(b). Thus, in exchange for a favorable freight rate, Looza accepted the practical and financial responsibility to load and secure the cargo. In doing so, Looza insulated Armada from contractual liability for problems with the stow, especially in light of Looza's obstinate refusal to undertake the expense to better secure the cargo via pallets and more sophisticated compartmentalization as suggested by Captain van Havre and Pat Lee, among others.

■ Looza's reliance on Clauses 25, 27, and 42 is misplaced. Looza cannot hide behind the Master's responsibility to supervise the loading and stowing when Looza withheld from the Master valuable information that would have in all likelihood affected the Master's supervision and ultimate approval of the stow. Consequently, the court rejects Looza's cross claim, and finds that Armada did not breach the contract of affreightment and is not liable in any way to Looza or Juice Bowl.[18]

## 2. *Armada v. Looza*

■ Armada has stated a cross claim against Looza based upon an alleged breach of their contract of affreightment, and a breach of Looza's duty under the general maritime law to disclose the dangerous nature of the drummed cargo being shipped pursuant to the contract. Armada's breach of contract claim is predicated upon a claim that Looza's cargo was "insufficiently and inadequately packed...." (Doc. 23 at ¶ 32.) As the court has determined that the list and resulting damages in the instant case were caused by Looza/Juice Bowl's unwillingness to pay for better stowage combined with the Master's choices to use the pipe stanchions and later to seek refuge in Bermuda, the court rejects Armada's contention that the cargo was inadequately packed. The lack of damage to the cargo supports this conclusion as well. Thus, the court rejects the portion of Armada's cross claim that relies on a theory of inadequate packing to establish a breach of the contract of affreightment by Looza.

Instead, the court finds merit in Armada's second contention: that Looza breached its duty at law to inform Armada overtly of the potential hazards of this cargo based on the ill-fated voyages of 1993. Further, because this second portion of Count I of Armada's cross claim against Looza mirrors Armada's cross claim against Juice Bowl, and because both claims are grounded in negligence and not contract, the court will treat Armada's cross claims against Looza and Juice Bowl simultaneously.[19]

---

**18.** In addition to Looza's cross claim against Armada, Juice Bowl advanced a cross claim against Armada. Juice Bowl's cross claim only states that: (1) "[a]t no material times relevant to this voyage was Juice Bowl the owner of the cargo;" and (2) "In the event that this Honorable Court holds Juice Bowl liable for any alleged breaches, which is hereby denied, then Juice Bowl requests indemnity or contribution from ... Armada ... based on the same theories of cross-claim as set out above by Looza against Armada." (Doc. 14, at 10–11.) Inasmuch as Looza's cross claim against Armada was predicated entirely upon alleged breaches of the contract of affreightment, to which Juice Bowl was not a party, the court finds Juice Bowl's cross claim untenable without further discussion.

**19.** Further, the court has previously determined, as a matter of fact, that Looza and Juice Bowl possessed the same degree of knowledge concerning the problematic voyages of 1993. Thus, they were, therefore, both in a position to inform the other interested parties to the venture of the potential danger of another break-bulk shipment.

Under the general maritime law, cargo owners and shippers each have a duty to warn other interested parties in the maritime venture of any inherent dangers in the cargo of which they know or should know and which the others could not reasonably be expected to know. *See Sucrest Corp. v. M/V Jennifer*, 455 F.Supp. 371, 384 (D.Me.1978) (citing *The William J. Quillan*, 180 F. 681, 682–84 (2d Cir.), *cert. denied*, 218 U.S. 682, 31 S.Ct. 229, 54 L.Ed. 1208 (1910)) (as to a cargo owner); *Ente Nazionale Per L'Energia Electtrica*, 774 F.2d at 655 (as to a shipper); *accord Boykin v. Bergesen D.Y. A/S*, 835 F.Supp. 274, 278 (E.D.Va.1993), *aff'd*, 73 F.3d 539 (4th Cir.1996). Armada claims that both Looza and Juice Bowl have breached this duty imposed by the general maritime law in the case at bar. The court agrees. As evident by the discussion throughout the foregoing portions of this order, Looza and Juice Bowl were the only parties to the MERCHANT venture who were involved in the problematic 1993 voyages and were, therefore, the only parties to this case with full knowledge of the full range of unsuccessful attempts to secure the break-bulk cargo of plastic drums. The evidence produced at trial convinces the court that neither Looza nor Juice Bowl intended to disclose the extent of the previous problems to Narcissus or Armada.

Further, as a matter of fact, the court finds that the dangers associated with the break-bulk shipment of the plastic drums were not patently obvious. Both Narcissus and Armada employees testified that they had previously shipped similar cargo, be it in steel drums or barrels of similar weight. The record evidence undisputedly establishes that the voyage of the MERCHANT was the first encounter with the plastic drums at issue for all of the interested parties, except Looza and Juice Bowl. Thus, the parties other than Looza and Juice Bowl had no way of knowing of any problems associated with the carriage of the plastic drums. Consider-

ing all of these facts and the reasonable inferences drawn therefrom, the court concludes that Looza and Juice Bowl breached their duty under the general maritime law to inform Armada of the dangers inherent in their cargo.[20] As such, the court holds Looza and Juice Bowl jointly and severally liable to Armada in the amount of $114,196.82, in accordance with the court's apportionment of fault in this case.

Count II of Armada's cross claims against Looza and Juice Bowl, respectively, is for contribution or indemnity. Armada was held contractually liable for $732,527.19 which represents Narcissus's damages under Clause 4 of the charter party between itself and Armada. *See* Section III(A)(1), *supra*. The court found as a matter of fact, however, that Armada was not at fault for any of the incident underlying this litigation. Armada is now due indemnity from Looza because Looza, in Clause 5(b) of its contract of affreightment with Armada, assumed the duty to load and stow the cargo aboard the MERCHANT. The court finds that Looza breached Clause 5(b) of its contract with Armada for which it owes Armada indemnity. Similarly, Juice Bowl, as discussed earlier in this order, breached its duty under the general maritime law to inform Armada of the dangerous propensities of the cargo. As such, the court finds that Juice Bowl's dereliction in this regard obliges it to indemnify Armada in the amount for which it was held liable to Narcissus. Juice Bowl is therefore jointly and severally liable with Looza to Armada in the amount of $732,527.19.

### D. Claims Involving PCS

At the close of all the evidence, on June 11, 1996, the court granted PCS's renewed motion for judgment as a matter of law. In essence, the court ruled that PCS was entitled to judgment as a matter of law because they completed their duties in a workmanlike

---

**20.** Even if Looza/Juice Bowl did not subjectively believe the plastic drums in which they shipped their juice were a dangerous cargo, they had no choice but to know that every previous break-bulk shipment of the drums had been problematic and had resulted in a list of some degree. It was this information that Looza/Juice Bowl with-

held which would have given Narcissus and Armada a chance to know the potential hazards of the MERCHANT voyage. Without the information, Narcissus and Armada were left to make a decision to participate in the venture with much less that complete information as to the potential danger to the ship and crew.

manner in accordance with the general maritime law, and because they did not breach their stevedoring agreement in executing their duties. The court found that the stow failed, not due to any negligence on the part of PCS, but because of other failures in the structure and equipment of the ship as well as the reluctance of Looza/Juice Bowl to pay for the appropriate stowing materials. Thus, the court found that PCS should bear no liability on any of the claims against it in the case at bar. The only claims PCS made in this case were for contribution and indemnity. In light of the court's ruling on PCS's motion, these claims need not be addressed further.

## IV. Conclusion

After reviewing the proceedings and evidence in this case, the court concludes that the list experienced aboard the MERCHANT on January 14, 1996 was caused by the inability of the vessel's side shoring to contain the cargo and by Looza/Juice Bowl's refusal to pay for the necessary securing materials as well as their failure to inform the other interested parties in this venture of the previous shifting episodes. Further, the damages suffered by the parties at bar were exacerbated by the Master's decision to seek refuge at a port in Bermuda that lacked the necessary refrigeration facilities to store the cargo during the necessary restow. Thus, the court assigns sixty percent of the fault for this incident and resulting damages to Narcissus on whose behalf the Master acted in erecting the side shoring and seeking refuge in Bermuda. The court assigns the remaining forty percent of the fault to Looza and Juice Bowl jointly and severally for consciously refusing to overtly inform Narcissus and Armada of the substantial problems, and lack of effective solutions, encountered with the plastic drum cargo in 1993. Finally, inasmuch as the court granted defendant PCS's renewed motion for judgment as a

matter of law at the close of evidence at trial, the court holds that PCS bears no responsibility for the incident aboard the MERCHANT.

In accordance with these findings of fact, the court holds Armada liable to Narcissus in the amount $732,527.19 for breach of Clause 4 of their charter party, as discussed in Section III(A)(1) of this order. Looza and Juice Bowl are jointly and severally liable to Narcissus in the amount of $362,076.46 for breaching their duty under the general maritime law to inform Narcissus of the dangers associated with their cargo as discussed in Section III(A)(2) of this order.

The court further concludes that Narcissus is liable to Armada in the amount of $285,-492.05 for providing Armada an unseaworthy ship, in violation of their charter party, through the Master's use of the vessel's pipe stanchions to contain the cargo, as more fully set forth in Section III(B)(1). Narcissus is also liable to Looza in the amount of $164,-483.87 on Looza's counter claim resolved in Section III(B)(2) of this order.

In accordance with Section III(C)(2) of this order, the court concludes that Looza and Juice Bowl are jointly and severally liable to Armada in the amount of $114,196.82 for failing to inform Armada of the problematic 1993 voyages involving the cargo of plastic drums. Lastly, Looza and Juice Bowl are jointly and severally liable in indemnity to Armada in the amount of $732,527.19, also in accordance with the discussion in Section III(C)(2) of the order.

The court holds that prejudgment interest is due on each of the principal amounts listed above at a rate of 3.74% running from February 15, 1994 through the date of this order.[21] The clerk of court is directed to enter judgment in accordance with this order. All claims for attorneys' fees and costs should be

---

21. *See Sabine Towing & Transp. Co. v. Zapata Ugland Drilling, Inc.*, 553 F.2d 489, 490–91 (5th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977) (noting that an award of prejudgment interest is the rule rather than the exception in admiralty cases). The interest rate is the one designated for the period encompassing February 15, 1994 in 28 U.S.C. § 1961 (West 1996). The court used February 15, 1994 as the

date of the loss because the evidence established that the MERCHANT arrived in Port Canaveral for the restow on January 29, 1994 and did not sail for Europe for approximately two more weeks, during which time many of the compensatory damages at issue in the instant case accrued. Thus, inequity would flow from an earlier assessment of interest.

submitted in accordance with Rule 4.18 of the Local Rules for the United States District Court for the Middle District of Florida.

It is **SO ORDERED.**